**BURNETT ELECTRONICS LAB., INC.**
v.
**The UNITED STATES.**
No. 489–71.

United States Court of Claims.
June 20, 1973.

Donald H. Seifman, Washington, D. C., attorney of record, for plaintiff.

David R. Schlee, Washington, D. C., with whom was Asst. Atty. Gen., Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG, and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on defendant's motion, filed April 17, 1973,

and plaintiff's consent thereto, filed May 1, 1973, requesting that the court adopt in its entirety the report and recommended decision filed March 8, 1973, by Trial Commissioner David Schwartz pursuant to Rule 166(c) on plaintiff's motion and defendant's cross-motion for summary judgment. Upon consideration thereof, without oral argument, since the court agrees with the decision, as hereinafter set forth, it hereby affirms and adopts the same, granting defendant's said motion of April 17, 1973, as the basis for its judgment in this case. Therefore, plaintiff is not entitled to recover, defendant's cross-motion for summary judgment is granted, plaintiff's motion for summary judgment is denied and the petition is dismissed. *Cf.* Astro Science Corporation v. United States, 471 F.2d 624, 200 Ct.Cl. —— (Jan.1973).

Opinion of Commissioner*

SCHWARTZ, Commissioner:

Cross-motions for summary judgment require decision on two alternative claims by a Government contractor under a completed contract with the Navy. The first is a Wunderlich Act challenge to a determination of the Armed Services Board of Contract Appeals that the terms of the contract unambiguously required that a preproduction sample to be submitted by plaintiff-contractor conform strictly to the specifications—that the contract did not, reasonably interpreted, permit the sample to be merely representative of the units later to be produced in accordance with the specifications. The issue presents a question of law on which this court is free to make its own decision.

The second prays for reformation of the contract, and for damages for breach of contract as reformed. The reformation desired would rectify an alleged mistake in the contract, to provide that the preproduction sample of the units to be produced under the contract might be "representative" of units conforming to specifications, and thus need not conform strictly to specifications. This claim, not within the Board's jurisdiction (and not made before the Board), is entitled to a full, sometimes called de novo, hearing in which, however, any relevant findings of the Board are binding. United States v. Utah Constr. & Mining Co., 384 U.S. 394, 412–413, 418–419, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). The parties are in agreement that this claim may be decided on the record made before the Board.

I

Plaintiff was the low bidder on a fixed price contract awarded on December 19, 1962 for the supply to the Navy of 48 hand-held sonar sets for use by underwater divers, at a price of $921 each. The contract provided that plaintiff was, as a new supplier of such sets, required to submit a preproduction sample, fully tested by the contractor at its plant. Ninety days were allowed, after delivery of the sample, for the Government to test and conditionally to approve or disapprove. Following approval, production could take place.

Prior to the advertisement of the contract, plaintiff had designed and produced a hand-held sonar set for underwater swimmers, called in the case the "off-the-shelf" unit, which plaintiff believed to be the best set yet developed. Plaintiff planned to submit the off-the-shelf unit as the preproduction sample under the contract and apparently expected that it could thereby begin production promptly after the award. After the award was made, the Navy's technical representatives found that the off-the-shelf unit did not conform to the specifications for the set specified in the contract, and the Navy insisted that in compliance with the contract plaintiff design and produce a preproduction sample, and thereafter production units, in conformity with the specifications.

This plaintiff eventually did, but at costs greater than it would have incurred had it been permitted to submit its off-

---

* The necessary facts are stated in the opinion.

the-shelf unit as the preproduction sample. These extra costs are now in suit. The Board found that the off-the-shelf unit did not conform to the specifications and that the contract clearly required the preproduction sample to conform strictly to the specifications; the contract language was implicitly held to be unambiguous. Burnett Electronics Lab., Inc. ASBCA No. 13663, 70–2 BCA Para. 8536, rehearing denied, June 15, 1972.

Of the several contentions made to the Board and repeated in the petition, only one[1] requires resolution—that the contract is ambiguous and was reasonably interpreted by the plaintiff to allow the required preproduction sample to be merely "representative" of the production units, without conforming strictly to specifications for the production units.

The claim is based on the following quoted language, in which the words "preproduction equipment" refer to the preproduction sample and the words "production equipment" mean the 48 units to be produced in accordance with the specifications in the contract:

SPECIFICATIONS AND SPECIAL
    PROVISIONS:

PREPRODUCTION EQUIPMENT:

1 equipment under Item 1 (herein called the "preproduction equipment"), conforming in every respect to the requirements set forth under the heading "PRODUCTION EQUIPMENT" and manufactured with tools, materials and methods which are the same as or representative of those which will be used in the manufacture of the equipment to be furnished under Item(s) 1 (herein called "production equipment"), shall be submitted by the Contractor for approval by the Government. Said equipment shall not be submitted until after it has been fully tested by the Contractor at its plant to determine compliance with the aforesaid specification and prelim-

inarily accepted by the cognizant Naval Inspector * * *. * * *

\* \* \* \* \* \*

PRODUCTION EQUIPMENT: Equipment shall be in accordance with Military Specification MIL–D–22702–(SHIPS), dated 3 November, 1960 * * *.

Plaintiff relies primarily on the words "manufactured with tools, materials and methods which are * * * representative of those which will be used in the manufacture" of the production units. Tools and methods used in the manufacture of the sample may vary from those used in the manufacture of the production units. Accordingly, plaintiff says, "materials" may also differ from the materials called for in the specifications and may merely be "representative."

The difficulty with this interpretation is that earlier in the quoted clause the preproduction sample is unmistakably described as a unit "conforming in every respect to the requirements" of the specifications for the production units. The whole sentence requires both that the sample conform "in every respect" to the specifications for the production units *and* that the sample be "manufactured with tools, materials and methods which are the same or representative of those" to be used in the manufacture of the production units. The provisions concerning manufacture relate to the process of making, not to compliance of the finished products with specifications, and do not derogate from the earlier-stated requirement that the sample conform in every respect to the specifications.

If further evidence were needed, it is found in the next sentence, which provides for testing by the contractor "to determine compliance with the aforesaid specification," and in the further provision, elsewhere in the contract, for a period of 90 days following submission of the sample, in which the Navy would itself test the sample for compliance with the specifications. It should be expected

---

1. No effect is made to support vague intimations of error by the Board in findings of fact.

that a new supplier's preproduction sample, on whose acceptance and approval production may begin, will be required to conform to specifications, and the contract language here abundantly so provided.

■ There is no ambiguity. The contract is plain against plaintiff. The claim does not get past the first of the several hurdles for such claims of ambiguity—that there be in fact an ambiguity, and that the claimant's interpretation be reasonable. Bishop Engineering Co. v. United States, 180 Ct.Cl. 411 (1967); Southern Constr. Co. v. United States, 176 Ct.Cl. 1339, 364 F.2d 439 (1966).

If there were any ambiguity from the clause beginning with the word "manufacture," the companion clause—"conforming in every respect to the requirements" of the specifications—made the ambiguity so patent that plaintiff could not resolve the ambiguity in its own favor without bringing the matter to the attention of the Government's officers. Having failed to do so, plaintiff assumed the risk of what is now seen to be its error in interpretation. Space Corp. v. United States, 470 F.2d 536, 200 Ct.Cl. —— (1972).

There are other defects in plaintiff's case. One is that plaintiff has not shown and indeed, makes no effort to show that its unit was in fact "representative," as plaintiff says it believed it was—that is, that the set departed so minimally from the specifications that plaintiff could and did in good faith believe it to be "representative" of the production units and thus a preproduction sample permissible under plaintiff's claimed interpretation. The Board found on good evidence that the plaintiff's unit departed from specifications by reason of nonstandard electronic component parts, method of assembly and protective coatings. Plaintiff does not explain how a unit may depart from specifications in such obviously substantial respects and still be "representative" of units which comply with specifi-

cations. Absent such a showing, there is no foundation laid for the claim that plaintiff in the course of its bidding actually held to and relied upon the interpretation it now espouses. See Young Associates, Inc. v. United States, 471 F. 2d 618, 200 Ct.Cl. —— (1973).

Plaintiff's president repeatedly testified that its off-the-shelf unit did in fact conform to specifications, and, in almost the same breath, that there were "minor" departures from specifications which he expected to eliminate following its conditional approval. The Board found that plaintiff did in fact realize that its set did not comply. The evidence, including this finding, which is well-supported, indicates that plaintiff, knowing that its off-the-shelf unit did not comply, nevertheless hoped somehow to sell it to the Navy as a substitute for complying units. One effort in this direction was an "alternative proposal" submitted with the bid, in which plaintiff offered the Navy its off-the-shelf unit at a price $66 lower per unit than the price quoted for the unit described by the specifications. The proposal was submitted in response to an invitation, in the bid papers, to submit cost saving proposals "for changing the drawing, specification or similar contractual requirements applicable to the supplies to be furnished under this contract," which "would result in less costly supplies than those specified herein without impairing any of their essential functions and characteristics." The already-designed, off-the-shelf unit, plaintiff said, was "more desirable for the Navy than any other unit yet produced" and would meet "all necessary requirements" of the specifications for the advertised unit. In this alternate proposal plaintiff was all but admitting that its off-the-shelf unit was different from that called for by the specifications and was urging it upon the Navy in preference to the specified unit.

After rejection of the alternate proposal, plaintiff continued, vainly, to seek acceptance of the off-the-shelf unit under the contract. Before the award a

Government officer came to survey plaintiff's plant, to determine plaintiff's capacity to perform the contract. Plaintiff told him that it would begin production based on the preproduction sample which it had ready, and that it could go into production almost immediately. The officer reported that: "Based on the bidder having the preproduction unit on item 1 completely designed and the tooling for the enclosure completed, production can begin two to three days after receipt of the contract." The pre-award-survey officer was no engineer. He recorded no interpretation by plaintiff that a non-complying, merely representative unit could pass muster as the preproduction sample. He was not there to, and did not, pass on the off-the-shelf unit as a preproduction sample. He was there to gather data on whether plaintiff could perform in the specified time. Plaintiff was either naive or misleading when it advised him that the preproduction unit was "completely designed" and that it could begin production immediately, if only because the off-the-shelf unit had never been tested, as required for compliance with the specifications. The episode proves no element of plaintiff's claim, but only that plaintiff, new to Government business, impractically held to a plan to submit the off-the-shelf unit in performance of the contract.

Even after the contract award, plaintiff apparently still hoped to sell its set to the Navy, by means of a waiver of the specifications. When a Government inspector visited plaintiff's plant soon after the award, plaintiff's president told him that he intended to use the off-the-shelf unit as the required preproduction sample—and, further that he wanted military specificatiom MIL–D–22702—the specification for the production units—"deleted from the contract." The juxtaposition of the statement of an intention to present the off-the-shelf unit as the preproduction sample with a request that the sample be freed from compliance with the specifications corroborates that plaintiff had little belief in or reliance upon an interpretation of

the contract by which the off-the-shelf unit could be accepted as the preproduction sample.

## II

The claim for reformation, too, must fail.

■ Reformation is appropriate to rectify a plain mistake—usually clerical or arithmetical—in the formation of a contract, to conform the words of the contract to those the parties actually intended. Bromion, Inc. v. United States, 188 Ct.Cl. 31, 35, 411 F.2d 1020, 1022 (1969); Space Corp. v. United States, *supra*. The remedy has been extended from its traditional area of application —mutual mistake by the parties—to include cases where the Government knew or should have known of a mistake in a bid costly to the bidder. Southwest Welding & Mfg. Co. v. United States, 179 Ct.Cl. 39, 51, 373 F.2d 982, 989 (1967); Chernick v. United States, 178 Ct.Cl. 498, 504, 372 F.2d 492, 496 (1967); Ruggiero v. United States, 190 Ct.Cl. 327, 335, 420 F.2d 709, 713 (1970). The theory of these cases is that the Government should share in the risk of loss as a matter of equity (National Presto Indus., Inc. v. United States, 167 Ct.Cl. 749, 764–769, 338 F.2d 99, 108–112, cert. denied, 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965); Tombigbee Constructors v. United States, 190 Ct.Cl. 615, 626–627, 420 F.2d 1037, 1043 (1970)) or that the Government overreached the bidder or otherwise acted unconscionably (*see* Doke, Mistakes in Government Contracts—Error Detection Duty of Contracting Officers, 18 Sw.L.J. 1, 10, 40–43 (1964)).

■ There is no trace here of any mutuality of mistake, and the conduct of the Government's officers gives no ground for any charge that they acted unconscionably or otherwise overreached the plaintiff in the treatment of the bid, the award of the contract, the pre-award-survey or otherwise. The pre-award-survey officer did no wrong; he did not mislead plaintiff or estop the

Government, and he did not learn of any mistake by plaintiff, in contract interpretation or otherwise. When the bid arrived, a request was made to the contractor that he verify it because the price appeared to be too low; it was promptly verified. No wrongful conduct is shown.

Finally, there is no evidence that the Government intended to be bound to the contract as plaintiff would rewrite it, and little or no evidence that even plaintiff intended to be bound by the version it seeks now. There is in short no evidence of any mistake for which reformation would be appropriate. Plaintiff speculated unsuccessfully on its ability, by one method or another, to substitute its unit for the specified unit. Put most favorably to plaintiff, the evidence is that plaintiff made a unilateral, unreasonable misinterpretation of the contract. No remedy lies for such mistakes.

The Government's motion for summary judgment is granted, the plaintiff's motion denied, and the petition dismissed.