**GOULD, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 95–88 C.**

United States Claims Court.

Jan. 16, 1990.

James W. Midgley, Los Angeles, Cal., for plaintiff.

Elizabeth S. Woodruff, Washington, D.C., with whom was John R. Bolton, Asst. Atty. Gen., for defendant.

## OPINION

RADER, Judge.

Plaintiff, Gould Incorporated, entered into a $44,778,779.00 procurement contract with the Naval Electronics System Command (the Navy). The five-year, fixed-price contract required plaintiff to produce BANCROFT VHF–FM tactical radios (Bancroft radios). The contract contained a detailed production and delivery schedule. If plaintiff did not meet this schedule, the Navy could terminate the contract for default.

Plaintiff at first concentrated on modifying the design of the Army Bancroft radio to conform with Navy specifications. Once underway, however, plaintiff realized that far more original design work would be necessary. Plaintiff successfully negotiated a one-year postponement of testing deadlines. Nonetheless, plaintiff did not meet the modified deadline. Plaintiff did not deliver any conforming goods under the contract.

In December 1986, plaintiff filed a claim with the contracting officer. Plaintiff sought reformation of the contract to recover more than $57 million for unanticipated design work. Before the contracting officer disposed of the claim, plaintiff and the Navy entered into an agreement to terminate the contract for default. The parties agreed that plaintiff could still pursue its pending claim.

In January 1988, the contracting officer denied plaintiff any equitable relief. Plaintiff sought *de novo* review in the United States Claims Court. Defendant moved to dismiss the entire complaint for failure to state a claim. Defendant also raised jurisdictional issues.

After oral argument, this court concludes that it has jurisdiction to dispose of plaintiff's claims. This court must dismiss the entire complaint, however, for failure to state a claim upon which relief can be granted.

## FACTS

In August 1982, the Navy informed plaintiff and other electronics companies of its interest in procuring Bancroft radios. The Navy described the radio system and stated its intent to offer a firm, fixed-price, five-year procurement contract. On April 9, 1983, the Navy issued the request for proposals (RFP) for production of the radios. The RFP contained a detailed performance specification.

While the Army previously had procured a Bancroft radio, the Navy issued more exacting performance requirements. Due to design differences, the Army radio design accompanied the Navy's RFP under the heading "for informational purposes only." Under the RFP, the contractor accepted the risk of additional design work. Plaintiff's request for reformation before the contracting officer quoted from the RFP:

The Contractor acknowledges that it was given an opportunity ... to thoroughly inspect the Government-furnished models, drawings ... and that it was incumbent upon the Contractor to include in

the offered price an amount sufficient to cover the risk that difficulties may be experienced in attempting to achieve the combined requirements ... set forth above.

Request for Equitable Reformation and Upward Adjustment in Price of Contract N00039–84–C–0168 (Request for Reformation), at 4.

On May 11, 1983, the Navy conducted a question and answer session for prospective bidders. The Navy answered questions about the relationship between the Army drawings and the Navy performance specification. The Navy also answered questions about the likely amount of design work and the availability of technical data about the Army radio or the Navy performance specifications.

In its answers, the Navy clarified that the Army drawings served an informational purpose only. The contracting officer stated at the question and answer session:

The Navy has supplied sufficient documentation that was delivered under the Army contract that will allow an astute contractor to assess the implications of any ... changes made by the contractor to the design of the BANCROFTS delivered under the Army contract.

*See* Request for Reformation, at 15. The contracting officer further indicated that the RFP allowed sufficient time to design a radio that satisfied performance requirements.

When asked about additional technical data, the Navy declined to release additional information until after awarding the contract. Moreover, several test results were not yet available to the Navy.

Plaintiff submitted its bid on June 28, 1983. The Navy awarded plaintiff the contract on October 3, 1983 for a price of $44,778,779.00.

The contract required plaintiff to test the new radio eighteen months into the contract. If plaintiff did not meet this deadline, the Navy could terminate the contract for default. Section C(d) of the contract states:

If the contractor fails to deliver any first article approval test report within the

time or times specified ... the Contractor shall be deemed to have failed to make delivery within the meaning of the "Default" clause of this contract, and this contract shall be subject to termination for default....

Plaintiff initially attempted to redesign the Army Bancroft radio to satisfy Navy performance requirements. Between December 1983 and October 1984, plaintiff discovered that the Army radio chassis did not satisfy the Navy's size, vibration, and repairability specifications. To accommodate these redesign efforts, plaintiff and the Navy negotiated a modification of the contract. The modification postponed initial product testing until September 1985. The parties did not, however, amend the long-term delivery schedule.

Due to the need for additional design work, this schedule slipped even further. In May 1985, plaintiff predicted that it could deliver a First Article Test Report by January 1986, but later postponed delivery of the report until April 1987.

Plaintiff performed far more design work than reflected in its bid. Plaintiff stated:

The design and development effort Gould has been required to undertake is far more than ever anticipated. In preparing its Best and Final Offer, Gould estimated that 38,929 engineering hours would be necessary for design and development. Through August, 1986, 187,785 engineering hours have been charged exclusive of consultants and subcontractors. Some $16,219,396 in nonrecurring design and development effort has been expended, with an additional $5,514,461 in nonrecurring effort estimated through First Article Tests.

Request for Reformation, at 19–20.

On December 11, 1986, plaintiff submitted a claim to the contracting officer. The claim asked for reformation of the contract to compensate plaintiff for additional design and development costs. Plaintiff set forth three bases for its reformation claim. First, the Navy violated 10 U.S.C. § 2306 (1988) by failing to supply a

stable design for the Navy Bancroft radios. Second, the Navy withheld documents that would have permitted bidders to estimate accurately the necessary design effort. Third, plaintiff and the Navy were both mistaken at the time of contracting about the amount of necessary design work.

Before the contracting officer reached a decision on the claim, plaintiff and the Navy entered into an agreement to terminate the contract for default. Under this December 9, 1987 agreement, the Navy waived its right to demand damages or reprocurement costs. Plaintiff agreed to reimburse the Navy for any progress payments. Plaintiff also waived all claims against the Navy, except the pending claim for reformation.

On January 8, 1988, the contracting officer issued a final decision denying plaintiff's claim for reformation. The contracting officer reasoned: (1) the contract satisfied the stable design requirement of § 2306, (2) the Navy did not withhold any information that plaintiff needed in order to bid or perform the contract, and (3) plaintiff cannot prevail on a mutual mistake claim where the contract placed the risk of design difficulty on plaintiff.

Plaintiff instituted this action in the United States Claims Court on February 12, 1988. Plaintiff sought *de novo* review of the claim denied by the contracting officer. Thus, plaintiff requested reformation on the same three grounds presented to the contracting officer.

Defendant moved to dismiss the entire complaint for failure to state a claim upon which relief can be granted. Defendant's motion and oral arguments also raised jurisdictional questions.

## DISCUSSION

When evaluating defendant's motions to dismiss—either for lack of subject matter jurisdiction or for failure to state a claim upon which relief can be granted—this court must accept the allegations made by plaintiff as true. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974) (subject matter jurisdic-

tion); *Featheringill v. United States*, 217 Ct.Cl. 24, 26 (1978) (failure to state a claim).

### Jurisdiction

■ The Tucker Act confers important jurisdiction on the Claims Court:

The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (1982). The Tucker Act alone does not create a substantive right to collect money damages from the Government. *United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). Instead, the Act empowers the Claims Court to enforce substantive rights embodied in the Constitution, federal statutes, regulations of executive departments, or contracts. *United States v. Mitchell*, 463 U.S. 206, 216–17, 103 S.Ct. 2961, 2967–68, 77 L.Ed.2d 580 (1982); *United States v. Connolly*, 716 F.2d 882, 885 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984).

Plaintiff invokes section 10 of the Contract Disputes Act of 1978 as the basis for jurisdiction:

Except as provided in paragraph (2) [action against Tennessee Valley Authority], and in lieu of appealing the decision of the contracting officer ... a contractor may bring an action directly on the claim in the United States Claims Court, notwithstanding any contract provision, regulation, or rule of law to the contrary.

41 U.S.C. § 609(a)(1) (1982).

The Claims Court may only grant equitable relief incident to a money judgment:

Where the relief is monetary, we can call upon such equitable concepts as recision and reformation to help us reach the right result.

*Quinault Allottee Assn. v. United States*, 197 Ct.Cl. 134, 138 n. 1, 453 F.2d 1272, 1274 n. 1 (1972); *see also, Pauley Petroleum*

*Inc. v. United States,* 219 Ct.Cl. 24, 40, 591 F.2d 1308, 1315, *cert. denied,* 444 U.S. 898, 100 S.Ct. 206, 62 L.Ed.2d 133 (1979). Defendant argues that no monetary judgment would stem from equitable relief in this case because plaintiff failed to deliver to the Navy any conforming goods.

■ United States Court of Claims precedent does not support defendant's argument. A contractor who defaults under a firm, fixed-price contract, without delivering any goods, nevertheless may recover money damages for an antecedent default by the Government. *Laka Tool & Stamping Co. v. United States,* 227 Ct.Cl. 468, 650 F.2d 270 (1981).

In *Laka Tool,* the contractor entered into a contract with the Government for the manufacture of rifle magazines. The Government's original specifications were impossible to satisfy. After the contractor incurred substantial costs attempting to do the impossible, the parties agreed to a modification. At length, the contractor could not deliver even under the modified specifications. The Government therefore terminated the contract for default.

The contractor sought reimbursement for the costs that it incurred in trying to meet the Government's impossible specifications. The Government contended that the contractor "should not be entitled to recover anything since it was properly defaulted and never delivered any acceptable goods under the contract...." *Laka Tool,* 650 F.2d at 271.

In *Laka Tool,* both the contractor and the Government defaulted on their contractual obligations. *Id.* Therefore, the Court of Claims ruled that the contractor's subsequent default was not a complete defense to the contractor's claim based on the Government's earlier default.

■ Plaintiff's allegations in the case at bar invoke the *Laka Tool* rule. Plaintiff alleged that the Navy was the first to default by failing to supply a stable design for the production of Navy Bancroft radios. Plaintiff also alleged that the Navy first defaulted by withholding vital information that would have assisted bidders in determining the extent of the design effort.

Plaintiff's Amended Complaint, filed July 20, 1988 (Complaint), at ¶¶ 15–19.

The Court of Claims in *Laka Tool* set forth four factors for deciding whether the contractor could obtain equitable relief and the corresponding reimbursement. First, the contractor must not default willfully or deliberately. In *Laka Tool,* the contractor defaulted "only after *bona fide* attempts to complete the contract which plaintiff was simply unable to do." *Laka Tool,* 650 F.2d at 272. Second, the contractor must incur additional cost as a direct result of the Government's default. Third, the contractor must seek recovery of only the excess costs incurred because of the Government's default. Fourth and finally, the Government's default must be "something [it] had no right to do under the contract." *Id.* Because *Laka Tool* was a case of "first impression," however, the Court of Claims considered none of the four factors independently necessary or determinative. *Id.*

In the case at bar, plaintiff's complaint satisfied the four *Laka Tool* standards. In the first place, plaintiff contended that its default was not willful or deliberate. According to plaintiff, "[t]he need for only minimal design and development effort was a basic assumption of the parties...." Complaint, at ¶ 26.

Second, plaintiff contends that it made a *bona fide* effort to deliver conforming goods under the Navy contract. In its reformation claim to the contracting officer, plaintiff explains in great detail its efforts to redesign the radio and still meet its production schedule. Plaintiff frequently encountered the need to adjust further the Army Bancroft radio design to meet Navy specifications. At one point, plaintiff conducted a review of the entire radio design, only to discover the need for more design work. For example, plaintiff had to redesign circuit card assemblies in much denser configurations than planned. This change meant that plaintiff could not use automated insertion equipment.

Third, plaintiff complained that it expended vast efforts solely due to the Navy's failure to provide a stable design

and to disclose vital information. Finally, plaintiff contended that the Navy had no right to omit a stable design from the contract specifications or withhold vital information. In its complaint, plaintiff alleges that 10 U.S.C. § 2306 requires inclusion of a stable design in a multiyear procurement contract. Plaintiff also asserted that defendant wrongfully withheld information during the bidding process. Complaint, at ¶ 22.

In sum, plaintiff's complaint addresses each of the factors cited by the Court of Claims in *Laka Tool*. Thus, assuming that reformation is an appropriate remedy and that plaintiff presented sufficient allegations to prevail on its claims, plaintiff would receive a money judgment. Consequently, this court has jurisdiction over plaintiff's complaint.

### Failure to State a Claim

RUSCC 12(b)(4) authorizes this court to dismiss a complaint for failure to state a claim. Where defendant's 12(b)(4) motion relies on the pleadings alone, this court's review has distinct limits:

> When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.

*Scheuer*, 416 U.S. at 236, 94 S.Ct. at 1686. Under this Supreme Court standard, this court may not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer*, 416 U.S. at 236, 94 S.Ct. at 1686 (*quoting Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). Thus, this court will dismiss only if plaintiff fails to allege facts for each requisite element of a

claim or admits facts that extinguish a claim for relief.

### Reformation

■ Reformation is an equitable remedy that adjusts a writing to reflect the intentions of the parties:

> The province of reformation is to make a writing express the agreement that the parties intended it should.... [R]eformation is available when the parties, having reached an agreement and having then attempted to reduce it to writing, fail to express it correctly in the writing. Their mistake is one as to expression— one that relates to the contents or effect of the writing that is intended to express their agreement—and the appropriate remedy is reformation of that writing properly to reflect their agreement.

*Restatement 2d Contracts* § 155, comment a (1981). The Court of Claims employed the reformation doctrine:

> The purpose of this remedy is to correct contractual instruments and make them conform to the clear intent of the parties.

*Highway Products v. United States*, 208 Ct.Cl. 926, 946, 530 F.2d 911, 922 (1976).[1]

■ Like its predecessor, the Claims Court has broad equitable powers incident to its authority to render money judgments. Reformation, however, is a form of equitable relief applicable only to a narrow set of circumstances. Thus, reformation corrects mistakes in reducing the parties' intentions to writing, but not mistakes that the parties may have made in actually forming the agreement. For example, plaintiff will not prevail if damage stemmed from the parties' inability to identify future risks when negotiating their agreement. *McNamara Constr. v. United States*, 206 Ct.Cl. 1, 509 F.2d 1166 (1975). The United States Court of Appeals for the Federal Circuit restated the purpose of reformation:

> The purpose and function of the reformation of a contract is to make it reflect the

---

1. The Court of Claims expanded the availability of reformation to pre-contractual mistakes in bidding, holding that such relief exists where the Government knew or should have known of a mistake contained in a bid. *Burnett Elecs. v. United States*, 202 Ct.Cl. 463, 479 F.2d 1329 (1973).

true agreement of the parties on which there was a meeting of the minds. *American President Lines, Ltd. v. United States*, 821 F.2d 1571, 1582 (Fed.Cir.1987).

■■■ Reformation only "rectif[ies] a plain mistake—usually clerical or arithmetical—in the formation of a contract, to conform the words of the contract to those the parties actually intended." *Burnett Elecs. v. United States*, 202 Ct.Cl. 463, 472, 479 F.2d 1329, 1333 (1973). Thus, reformation cases generally involve a dispute about a discrete provision of a contract. *See* Annotation, *Reformation by United States Court of Claims of Government Contract*, 19 A.L.R. Fed. 645, §§ 6–11 and cases cited therein (1974). Plaintiff also must show by clear and convincing evidence that defendant, at time of contract formation, would have agreed to the contract as reformed. *Fraas Surgical Mfg. Co. v. United States*, 215 Ct.Cl. 820, 825, 571 F.2d 34, 37 (1978). Consequently, to show entitlement to equitable reformation, a party must show both a clear agreement between the parties at the time of contracting and an error in reducing that agreement to writing.

To dispose of defendant's motion, this court shall first determine whether reformation is appropriate relief for the particular claims asserted by plaintiff. The court then will determine whether plaintiff's allegations, if sustained, would state a claim for relief.

### Violation of 10 U.S.C. § 2306

Plaintiff seeks reformation on the grounds that the Navy violated the multiyear procurement provisions of 10 U.S.C. § 2306(h)(1). The 1982 Act requires stable designs for multiyear contracts:

(h)(1) To the extent that funds are otherwise available for obligation, the head of an agency may make multiyear contracts ... for the purchase of property ... whenever he finds—

....

(D) that there is a stable design for the property to be acquired and that the technical risks associated with such property are not excessive....

10 U.S.C. § 2306(h)(1).

■■■ The Navy's purported violation of § 2306 alone does not justify reformation. If the Navy did not obey statutory requirements, the purported contract was null and void. *United States v. Amdahl Corp.*, 786 F.2d 387, 392 (Fed.Cir.1986). Moreover, an illegality during procurement precludes a contract from arising. *Id.* at 392–93. As a general rule, without a contract, a court would have nothing to reform.

■■■ This general rule, however, has two exceptions. First, a court may grant equitable relief under an illegal contract if the Government received a benefit from the contractor's performance:

[I]n many circumstances it would violate good conscience to impose upon the contractor *all* economic loss from having entered an illegal contract. Where a benefit has been conferred by the contractor on the government ... a contractor may recover at least on a *quantum valebant* or *quantum meruit* basis....

*Amdahl*, 786 F.2d at 393 (footnote omitted).

■■■ Second, a court may grant equitable relief under an illegal contract, even though the Government received no benefit, if the illegality was not plain or clear:

[T]he court should ordinarily impose the binding stamp of nullity only when the illegality is plain. If the contracting officer has viewed the award as lawful, and it is reasonable to take that position ... the court should normally follow suit. Any other course could place the contractor in an unfortunate dilemma.... The full risk of an adverse decision on validity would then rest on the bidder.... It is therefore just to the contractor ... to uphold the award unless its invalidity is clear.

*John Reiner & Co. v. United States*, 163 Ct.Cl. 381, 386–87, 325 F.2d 438, 440 (1963), *cert. denied*, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964).

Plaintiff satisfies neither of the exceptions. Plaintiff does not fall within the *quantum meruit* exception. The Navy did not receive a benefit under the contract. Plaintiff did not deliver any conforming goods. The default termination agreement signed by plaintiff on December 9, 1987 states:

> Gould has failed to make progress to an extent which will preclude its meeting the production delivery schedules stated in the contract.... [2]

Plaintiff also cannot claim that the alleged § 2306 violation was unclear at the time of contracting. Plaintiff knew, or should have known, that the contract did not contain a stable design. In its claim to the contracting officer, plaintiff noted that a stable design is easy to distinguish from performance specifications:

> There was no existing "design" at all, let alone a "stable design," since the new Navy specification was a *performance* specification requiring design and development effort....
>
> Without doubt, the Navy's specification is a performance-type specification. The Navy repeatedly described it as such in its answers to prospective contractor's questions....
>
> ....
>
> The distinction between design and performance specifications is well known in Government contracts.

Request for Reformation, at 32, 33. Plaintiff, an experienced contractor, should have known at the time it entered into the contract that a design specification was absent.

Plaintiff also stated in its claim to the contracting officer:

> The only "design" in existence for the Bancroft radio was the Army design which the Navy provided prospective contractors "for informational purposes

only." Additionally, the Army design was based on unapproved Army drawings the accuracy of which the Navy would not guarantee.... Further, the Navy indicated it would not provide any original Navy drawings.

Request for Reformation, at 32. Again, plaintiff should have known these conditions at the time it entered into the contract. The Navy's solicitation for bids explicitly stated that the Army designs were not part of the contract, but for informational purposes only. At the pre-bid conference, plaintiff heard the Navy refuse to guarantee the Army drawings and refuse to issue its own designs. Plaintiff cannot now contend that the Navy's alleged failure to follow the stable design requirement of § 2306 was unclear.

At oral argument, plaintiff suggested other signals of a stable design. According to plaintiff, completed testing and prior production runs show that specifications have matured into stability. Yet, plaintiff knew, at the time of contracting, that the Navy had not completed all tests and had not produced other radios. The Navy stated at the pre-bid question and answer session that its testing of the Army radio against Navy specifications was not complete. Defendant's Appendix, filed Oct. 28, 1988, at 196, 200. Further, plaintiff admitted at oral argument that it knew the Navy Bancroft Radio, with its particular performance requirements, had not been produced earlier. Plaintiff cannot claim the § 2306 violation was unclear. Plaintiff observed the factors that would alert a sophisticated contractor to the absence of a stable design.

Plaintiff also asserts an alternative theory for recovery. Plaintiff seeks reformation by showing that it is an intended beneficiary of § 2306.[3]

---

2. The default termination agreement is an unmarked exhibit attached to the complaint.

3. Plaintiff cites two Court of Claims decisions to support its alternative theory of recovery—*Applied Devices Corp. v. United States,* 219 Ct.Cl. 109, 591 F.2d 635 (1979) and *Chris Berg, Inc. v. United States,* 192 Ct.Cl. 176, 426 F.2d 314 (1970). *Applied Devices* does not establish an

alternative theory for recovery. Although the Government set an illegal cancellation charge ceiling, the record indicates that the Government benefitted from the plaintiff's performance. *Applied Devices,* 591 F.2d at 640. *Applied Devices* fits well within the *quantum meruit* exception.

 To the contrary, plaintiff is not an intended beneficiary under § 2306. The Government, rather than defense contractors, is the intended beneficiary of the multiyear procurement provisions.

Congress passed the multiyear procurement provisions of the 1982 Department of Defense (DoD) Authorization Act to enhance Government efficiency and economy. Congress stated in its Declaration of Policy:

> The Congress finds that in order to ensure national defense preparedness, to conserve fiscal resources, and to enhance defense production capability, it is in the interest of the United States to acquire property and services for the Department of Defense in the most timely, economic, and efficient manner. It is therefore the policy of the Congress that services and property ... be acquired by any kind of contract ... including multiyear contracts, that will promote the interests of the United States. Further, it is the policy of the Congress that such contracts ... provide for the purchase of property at times and in quantities that will result in reduced costs to the Government and provide incentives to contractors to improve productivity....

10 U.S.C. § 2301(a)(1) (1988). This language shows that Congress intended to promote efficiency in Government contracting policies at DoD.

Where Congress intended to enact procurement regulations for the benefit of contractors, it expressly stated its intentions. Congress explicitly stated that it enacted portions of the procurement provisions specifically to benefit small defense contractors. The Declaration of Policy announces:

> It is also the policy of Congress that a fair proportion of the purchases and contracts made under this chapter be placed with small business concerns.

10 U.S.C. § 2301(b). Plaintiff does not allege that it falls within this category. This language shows that Congress could have, but chose not to, make contractors like plaintiff a primary beneficiary of the 1982 Act.

Legislative history also suggests that Congress envisioned the Government as the intended beneficiary of multiyear procurement regulations. Secretary of Defense Caspar Weinberger testified:

> If changes are made to permit the increased use of multiyear contracts, we could expect to realize savings for these programs on which the technique is employed. Savings and other advantages may be achieved, through improved economies and efficiencies in the production processes, better utilization of industrial facilities, enhanced attractiveness of and competition for Government requirements, and a reduction of the administrative burden in the placement and administration of contracts. These advantages would enable us to make some of the substantial savings for which many critics of the Department are calling.

*Multiyear Procurement: Hearing Before the Committee on Armed Services, House of Representatives*, 97th Cong., 1st Sess., 6 (1981) (*Hearing*). Similarly, the House report on the 1982 DoD Authorization Act stated that multiyear procurement "can make important contributions to more efficient procurement for DoD and can lead to substantial cost savings in the expensive business of military weapons procure-

---

Plaintiff also invokes *Chris Berg, supra,* in support of its alternative theory. In *Chris Berg,* the Government violated the law at the acceptance stage by failing to give the contractor an opportunity to correct an obviously mistaken bid. The Government's refusal of a chance to correct the bid put *Chris Berg* in a no-win situation. If it rescinded its bid, the contractor would certainly have lost its bid bond. If it entered the contract, even under protest, the contractor risked losing costs not contained in the incorrect bid.

The Court of Claims ruled that regulations required the Government to permit the bidder to correct obvious errors. Therefore, the Claims Court's predecessor reformed the contract to correct the obvious bidding mistake.

In the case at bar, however, the Navy's § 2306 violation did not place plaintiff in such a bind. The illegality was plain and clear before bid submission. Unlike the contractor in *Chris Berg,* plaintiff could have withdrawn its bid without incurring any monetary damages. *Chris Berg* therefore fails to support an alternative theory of recovery for plaintiff in this case.

ment." H.R.Rep. No. 97–71, Pt. III, p. 20 (1981), U.S.Code Cong. & Admin.News, pp. 1781, 1801, 1817.

This court does not doubt that contractors as a class benefit incidentally from the procurement provisions enacted by Congress. Indeed, as Congressman Dan Daniel noted at the hearing on multiyear procurement:

> [A] broad range of witnesses agreed that an expanded use of multiyear contracting ... could result in substantial benefits to both the Government and industry....

*Hearing*, at 2. Secretary Weinberger also observed that multiyear procurement would "make the United States Government a far better customer than it has been." *Hearing*, at 6. In light of the language and purpose of the procurement provisions, however, these and other statements in Congress merely show that contractors are incidental beneficiaries. The Claims Court must draw a clear distinction between incidental and intended beneficiaries when deciding whether a particular statute establishes litigable rights. *Applied Devices*, 219 Ct.Cl. 109, 120, 591 F.2d 635, 640 (1979). The language and history of this statute do not show that Congress enacted the 1988 law to benefit contractors. Consequently, plaintiff fails to state a claim even under its alternative theory for recovery.

In sum, plaintiff's contention that defendant violated § 2306 fails to state a claim upon which this court can grant reformation. Reformation may remedy contract illegalities only in *quantum meruit* cases or unclear illegality cases. Furthermore, even assuming the validity of plaintiff's alternative theory for recovery, this court could not grant relief. Plaintiff is not an intended beneficiary under § 2306. Consequently, this court dismisses Count One of plaintiff's complaint pursuant to RUSCC 12(b)(4).

### *Superior Knowledge* [4]

■ Plaintiff complains that the Navy improperly withheld information that would have apprised it of the amount of design work needed to produce the Navy Bancroft radios. Damages, not reformation, is the appropriate remedy for this claim. Reformation equitably conforms a writing to the actual agreements of the parties. This claim presupposes that the Navy harbored a different understanding than plaintiff on what their agreement would require. Thus, taking plaintiff's superior knowledge allegation as true, this court cannot conclude that the parties agreed to the terms plaintiff desires to rewrite. The Navy cannot have both had superior knowledge of the contract's demands and had the same expectations and understandings as plaintiff.

Even if reformation was an available remedy, plaintiff does not state a claim. To state a superior knowledge claim, plaintiff must show four elements:

> The doctrine of superior knowledge is generally applied to situations where (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration, (2) the Government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the Government failed to provide the relevant information.

*American Ship Building Co. v. United States*, 228 Ct.Cl. 220, 225, 654 F.2d 75, 78 (1981).

■ Plaintiff made factual allegations in its complaint to support the first, second, and fourth elements of a superior knowledge claim. Plaintiff did not allege, however, either that the Government promulgated misleading contract specifications or that the specifications did not put bidders on notice to inquire about the amount of design work. Plaintiff alleges only that it was unaware of the amount of design work necessary to produce the Navy radio.

Plaintiff's pleadings show that bidders understood that the Army Bancroft Radio

---

4. For purposes of this motion, the court accepts plaintiff's contention that the complaint requests relief under the doctrine of superior knowledge.

would not meet Navy performance requirements. Plaintiff admits that the Navy provided the Army designs "for informational purposes only." Complaint, at ¶ 14. Plaintiff also concedes that the Navy would not guarantee the accuracy of the Army designs. The Navy did not mislead plaintiff.

In its request for reformation to the contracting officer, plaintiff quotes several exchanges at the pre-bid question and answer session where defendant clearly informed bidders of their redesign responsibilities:

A148. The Government will not accept equipment that does not comply with the maintainability requirements of [the solicitation]. Therefore every contractor should design equipment without maintainability deficiencies. The contractor must be aware that [the solicitation] is a performance specification which places the onus of compliance on the contractor.

. . . .

Q160. Does the Navy require all drawings that are not changed or redesigned to be redrawn in Navy format?

A160. Yes.

Q161. What type of original drawing format will the Navy provide to the successful bidder to convert the present drawing package into the required Navy format?

A161. The Navy will not provide any original drawings.

Request for Reformation, at 14.

Moreover, bidders did inquire about the extent of design work. Plaintiff references the following exchanges at the pre-bid question and answer session:

Q49. RFP Page 13, Section C, Specification Affectivity. The BANCROFT equipment ... was designed in accordance with the specifications and standards in effect on 15 June 1977. Does the Government require that the BANCROFT equipment be redesigned to meet the latest revisions of these applicable specifications and standards despite the cost impact?

A49. The Government requires the equipment meet the specifications and standards listed. . . .

. . . .

Q112. RFP requires [First Article] testing to be complete month 18. . . . This effort requires significant requirements to be completed in the first 12 months—i.e., redesign ... generate new master artwork patterns. . . .

Does the Navy with the current tech data ... believe there is a reasonable opportunity ... to meet the specification requirements in the time frame . . .?

A112. Yes. The Navy believes the 18 month requirement can be met.

Request for Reformation, at 10, 12–13.

In sum, plaintiff fails to allege facts that would show all the requisite elements of a superior knowledge claim. Consequently, this court must dismiss Count Two of plaintiff's complaint pursuant to RUSCC 12(b)(4).

### Mutual Mistake

■ Mutual mistake is the classic case for reformation. *Restatement 2d Contracts* § 155, comment a (1981). The Court of Claims clarified the types of mutual mistakes warranting equitable relief:

Except where the parties have failed to conform the written instrument to their actual understanding ... the courts generally, as well as this court, have been wary in granting relief from innocent mutual mistakes imbedded in, or underlying, consummated contracts.

*National Presto Indus. v. United States,* 167 Ct.Cl. 749, 761, 338 F.2d 99, 106–07 (1964) (citations omitted) (footnote omitted); *see also, Fraas Surgical, supra.*

■ Plaintiff must allege four elements to state a reformation claim based on a mutual mistake. First, the parties must have made a mistake at the time of contracting. Second, the mistake must involve a basic assumption of the contract. Third, the mistake must materially affect contract performance. Fourth, the party requesting reformation must not have agreed to bear the risk of a mistake. *National Presto,* 167 Ct.Cl. at 108–09, 338 F.2d 99; *see also,*

*13 Williston on Contracts* §§ 1535, 1543A, 1544 (3d ed. 1961).

■ Plaintiff fails to state a claim for reformation under the doctrine of mutual mistake. Plaintiff alleges facts that, if sustained, would show a mistake in forming the contract, but not in reducing the parties' intentions to writing. Plaintiff concedes that the parties did not make a mistake in conforming the written agreement to their intentions. According to plaintiff, "[t]he Navy believed that Contract ... could be completed with minimal design and development effort." Complaint, at ¶ 24. Plaintiff admits that it also made this assumption when entering into the contract. Nowhere in its complaint does the plaintiff state that the parties intended a substantial design effort but failed to express this understanding in their written agreement. Although it may have grounds for recision under the doctrine of mutual misunderstanding, plaintiff may not seek reformation for mistaken assumptions about future performance.

■ Plaintiff also fails to state a claim because its pleadings do not satisfy all the requisite elements of the mutual mistake doctrine. Specifically, plaintiff did not make allegations showing that it did not agree to bear the risk of a mistake. Rather, plaintiff agreed to accept risk of unanticipated design needs. The RFP stated that "it was incumbent upon the contractor to include in the offered price an amount sufficient to cover the risk that difficulties may be experienced" in meeting the contract specifications. *See* Request for Reformation, at 4.

The nature of this contract also reinforces plaintiff's acceptance of risk. As the *McNamara* opinion suggests, the Court of Claims "consistently held that the contractor in a fixed-price contract assumes the risk of unexpected costs." *McNamara*, 509 F.2d at 1169. Similarly, federal procurement regulations state:

> The firm fixed-price contract provides for a price which is not subject to any adjustment by reason of the cost experience of the contractor, in the performance of the contract. This type of contract ...

places maximum risk upon the contractor.

32 C.F.R. § 3.404–2 (1969), *quoted in ITT Arctic Servs. v. United States*, 207 Ct.Cl. 743, 763 n. 12, 524 F.2d 680, 690 n. 12 (1975). Plaintiff admits that it entered into a firm, fixed-price contract, but does not offer any allegations to rebut the presumption that it assumed the risk of additional costs. Consequently, this court must dismiss Count Three of plaintiff's complaint pursuant to RUSCC 12(b)(4).

## CONCLUSION

Plaintiff's complaint fails to state a claim upon which this court can grant the requested reformation. Reformation is not the remedy for the statutory violation alleged by plaintiff. Even if this court accepted plaintiff's alternative theory for reformation in the face of an illegal contract, plaintiff is not the intended beneficiary of § 2306.

This court cannot grant reformation for plaintiff's superior knowledge claim. In any event, plaintiff also failed to make allegations that, if sustained, would establish recovery against defendant. The specifications issued by the Navy did not mislead bidders and should have placed plaintiff on notice to inquire about the amount of design and development work.

Finally, plaintiff fails to state a claim for reformation under the doctrine of mutual mistake. Plaintiff complains of a mistake in forming the agreement, not in reducing the parties' agreement to writing. Furthermore, plaintiff does not allege facts that, if sustained, would prove all the requisite elements of a mutual mistake claim.

In the absence of a claim upon which the requested relief can be granted, this court directs the Clerk to enter judgment dismissing plaintiff's entire complaint under RUSCC 12(b)(4).

No costs.