**GOULD, INC., Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**No. 95–88C.**

United States Court of Federal Claims.

July 8, 2005.

Thomas M. Abbott, Los Angeles, CA, for Plaintiff.

David B. Stinson, with whom were Robert D. McCallum, Jr., David M. Cohen, and Bryant G. Snee, Department of Justice, Washington, D.C., for Defendant. Brad Johnson, Space and Naval Warfare Systems Command, San Diego, CA, Of Counsel.

John M. Bergen, Law Clerk.

## OPINION

BASKIR, Judge.

Plaintiff, Gould, Inc., is a defense contractor which agreed to produce "Bancroft" radios for the U.S. Navy pursuant to a firm fixed-price multiyear contract. It seeks judgment as a matter of law on Count I of its Complaint, alleging the violation by the Navy of both statutory and regulatory directives concerning the use of multiyear contracts for Department of Defense (DoD) procurements. The Defendant filed a cross-motion for summary judgment. Because we find that the statute and its implementing regulations were intended to benefit the United States, as opposed to the private contractor, we conclude that any violation is not actionable by Plaintiff. We, therefore, deny Plaintiff's motion and grant the Defendant's cross-motion.

## *BACKGROUND*

### I. PROCEDURAL HISTORY

#### A. *Prior Decisions*

This government contract case was filed in 1988. It was first dismissed on January 16, 1990, by Judge Rader, while sitting on this Court's predecessor, the Claims Court, for failure to state a claim upon which relief can be granted. *Gould v. United States,* 19 Cl. Ct. 257 (1990) (*Gould I* ). The U.S. Court of Appeals for the Federal Circuit vacated the decision. *Gould v. United States,* 935 F.2d 1271 (Fed.Cir.1991) (*Gould II* ). On remand, the case was assigned to Judge Diane Sypolt (then Weinstein); Judge Rader had since been appointed to the Court of Appeals. Judge Sypolt (Weinstein) again dismissed Plaintiff's claims. In an opinion dated October 29, 1993, she ruled that Gould's claim that the Government entered into an illegal contract defeated subject matter jurisdiction because the Complaint then necessarily relied upon an implied-in-law contract. *Gould v. United States,* 29 Fed.Cl. 758 (1993) (*Gould III* ). Once again, the Court of Appeals vacated this decision in an opinion issued on February 7, 1996. *Gould v. United States,* 67 F.3d 925 (Fed.Cir.1995) (*Gould IV* ). Soon thereafter, the Government filed a counterclaim and special plea in fraud.

#### B. *Pending Motions*

A lengthy discovery period, along with a temporary stay, dragged this case into 2002. Finally, dispositive motions were briefed with Plaintiff's motion to dismiss Defendant's counterclaim pled in the alternative as a motion for summary judgment.

Gould filed another dispositive motion, requesting partial summary judgment in its favor on Count I. This motion was met with a cross-motion for summary judgment by the Government. This is the matter we take up today.

With the Defendant's counterclaims and Plaintiff's first count still unresolved, the Government filed a motion for partial summary judgment on the allegations contained in Counts II and III. Once again, the opposing side, this time the Plaintiff, filed cross-motions in response. These motions are pending.

#### C. *Litigation Schedule*

This case was transferred from Judge Sypolt's docket to the undersigned in December 2004. On February 18, 2005, the Court held

a status conference to establish priorities for the pending matters and arrive at a schedule for disposing of all motions. Plaintiff and Defendant agreed that the Court should first address the cross-motions for summary judgment on Count I—Plaintiff's "illegal contract" claim. The parties submitted a Consolidated Statement of Uncontroverted Facts (CSUF), as required by this Court's Special Procedures Order. The Court heard oral arguments on the matter on June 21, 2005. Below, we discuss the illegal contract argument in detail. First, however, we find it helpful to briefly review the background of the procurement and the difficulties encountered in performance, which resulted in Gould's request for reformation of the contract. Readers are referred to the previous opinions, *Gould I–IV*, for additional background. Although we believe the following description is generally undisputed, we note that with one possible exception the motions before us involve statutory construction and are not fact-driven.

## II. SUMMARY OF THE CLAIM

### A. *The Bancroft Radio Procurement*

The contract at issue arises from a U.S. Navy procurement of radios intended for use by the Marine Corps. The Marine Corps requested that the Navy procure a "build to print" design of a previous defense contract—the Bancroft radio, a model produced for the U.S. Army by contractor Cincinnati Electronics. Because of production delays and modifications to this Army contract—awarded in 1978—the Bancroft radio had not yet stood the test of time when, in early 1980, Assistant Secretary of Defense for Research and Engineering Gerald Dinneen first directed the Navy to initiate a three-year production contract. CSUF 1–3. Ultimately, the Army opted not to use the radio at all. CSUF 5. At least as late as January 1982, the Marines persisted in the request for a design identical to the Cincinnati Electronics product. CSUF 4–5.

During the same time period in which the Navy was engaged in this procurement activity, the DoD and Congress had been considering various initiatives aimed at increasing multiyear contracting. In May 1981, Deputy Secretary of Defense Frank Carlucci issued a policy memorandum listing six criteria to be considered by appropriate agency personnel prior to entering into multiyear contracts: Benefit to the Government; stability of requirement; stability of funding; stability of configuration; degree of cost confidence; and degree of confidence in contractor capability. CSUF 6. Essentially, the policy sought to take advantage of "economies of scale" via multiyear contracts provided those advantages are "balanced against risks from unstable operational, technical, design, or quantity requirements." CSUF 6. Congress took up these issues in June 1981, with hearings in which the Secretary of Defense justified the expanded use of multiyear defense procurements, under the policy outlined in the Carlucci Memorandum. CSUF 7.

These initiatives were not universally supported. However, the end result was the passage on December 1, 1981, of the 1982 Defense Authorization Act, Public Law 97–86. The Act included section 909 amending 10 U.S.C. § 2306, the statutory provision detailing the types of contracts into which the Armed Services could enter, to include multiyear contracts. Section 909 states Congressional findings, removes geographic limitations, provides outlines of implementing regulations, and increases the dollar amount of permissible cancellation clauses. It also added a new subsection, Section 2306(h)(1)(A)-(E), requiring the head of an agency, statutorily defined as Assistant Secretary or higher, 10 U.S.C. § 2302, to make certain findings prior to pursuing multiyear acquisitions. *See* 10 U.S.C. § 2306(h)(1)(A)-(E). Although these provisions are now codified at 10 U.S.C. § 2306b(a)(1)-(6), we shall continue to cite the 1982 edition of the United States Code, as the parties have done in their papers.

In particular, the head of the agency, or a properly delegated official—in the case of a Naval procurement, for instance, responsibility has been delegated down to the heads of the respective contracting activity, *see* CSUF 14–17—must first make separate findings relating to such things as funding and requirements. One required finding—stability of design—lies at the heart of Plaintiff's case.

*See* § 2306(h)(1)(D). The implementing regulations supplement the statute in great detail. Among other things, they restrict multiyear contracts to fixed-price contracts and require the determinations to be in writing. Defense Acquisition Regulation (DAR) § 1–332.1(d)(4)(iv). While the parties agree that there is no discrete post-legislation written finding, the United States contends the Navy "substantially" complied with the statute. We address the conflicting views of the parties on this issue in our discussion below. As to the limitation of multiyear contracts to fixed-price contracts, the parties have not addressed the significance, if any, of this provision.

In the end, in August 1982, the Navy determined to issue performance specifications rather than rely on the design specifications of a build-to-print procurement. The reasons for this decision are touched upon summarily in the briefing and CSUF, and they are not pertinent to our discussion here. *See, e.g.,* CSUF 25–27. What is important for our purposes is that the decision to abandon the build-to-print strategy was a turning point with important legal consequences. No longer was the Navy seeking a procurement based on design specifications with its risk allocation to the Government. *See Stuyvesant Dredging Co. v. United States,* 834 F.2d 1576, 1582 (Fed.Cir.1987) (*Spearin* doctrine warranty attaches to design specifications, but does not protect a contractor in complying with performance specifications); *see also Trans Metro v. United States,* Case No. 01–533C (Fed.Cl. Mar. 7, 2005) (unpub.) (Applies standards for distinguishing between design specifications and performance specifications.)

The Navy's request for proposals (RFP) contained detailed performance specifications. It also included design specifications and drawings for the version of the radio previously developed for the Army which were labeled "for planning purposes only." CSUF 27. Gould contends that the required statutory finding of design stability constitutes a guarantee, and precludes any performance specifications. Thus the Bancroft contract, in Plaintiff's view, was a *per se* violation of the statute.

There is no statutory definition of "stable design" and the parties' definitions offered at oral argument differed greatly. In any event, Plaintiff suggests the Government's admissions demonstrate there was no stable design. *See* CSUF 28 (Plaintiff's Objection). Although this issue may be critical to other motions before us, Count I does not require us to look at the substance of the contract requirements. Compliance with the multiyear statute involves a much narrower question than whether a stable design existed.

**B. *Gould's Performance and Equitable Reformation Claim***

On October 3, 1983, the Navy awarded Gould a five-year contract to build the Bancroft-type tactical radios at a fixed price of $44,778,779.00. Soon thereafter, the Plaintiff apparently encountered difficulties in performing. Gould asserts that it attempted to redesign the Army Bancroft radio to satisfy the Navy's new performance requirements, but the company was unable to do so. Consequently, Gould performed additional design work, which it contends had not been contemplated or reflected in its bid, in an effort to meet the Navy's specifications. According to the Plaintiff, a simple upgrade of the Army model proved inadequate. Instead a complete redesign of the Army model was necessary. The Government maintains, however, that neither of the contracting parties anticipated that a simple redesign would suffice. The Navy emphasized the fact that its performance specifications were more demanding than those of the Army Bancroft radio, and Gould accepted the contract at the fixed-price offered. The Government also maintained that the company was using this opportunity to develop a radio with broader appeal to other prospective customers, and that this explains much if not all of its added research and development effort. In this respect, the Government argues, Plaintiff cannot establish injury, even assuming actionable statutory violations.

Still unable to perfect the radio, in December 1986, Gould submitted a certified claim to the contracting authority requesting "equitable reformation and upward adjustment in the price of [the] contract." In support of its

claim, Gould cited unanticipated, increased recurring costs resulting from achieving a much more complex "stable design" than envisioned. Gould also claimed that it was "entitled to equitable relief on other, independent grounds based on [the Government's] withholding of information and/or mutual mistake." The claim concluded with a pricing section which requested money damages in the amount of $57,545,719 for "excess development costs plus increased recurring costs."

In support of the requested relief, the claim asserted:

- that the Navy violated 10 U.S.C. § 2306(h)(1) and other regulatory provisions by entering into a multiyear contract in the absence of a stable design for the item to be procured;

- that prior to the award of the contract the Navy withheld information that would have permitted bidders to accurately estimate "the degree of design effort and risk involved in meeting the Navy's performance specification;" and

- that there was a mutual mistake on the part of both Gould and the Navy regarding a basic assumption of the contract, because each party believed "that only minimal design and development effort would be required."

The contracting officer denied Gould's claim in February 1988. In the interim between the submission of the claim and its denial, the Navy terminated the contract for default pursuant to an agreement with Gould preserving its present claims.

Plaintiff filed its Complaint in this Court on July 20, 1988, citing these same theories of relief as Counts I, II, and III, respectively. Gould has asked for equitable reformation of the contract, or in the alternative, compensatory damages in the amount of $36 million.

## DISCUSSION

### I. SUMMARY JUDGMENT STANDARDS

We apply the well-known standards for resolving summary judgment motions. Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. RCFC 56(c). A material fact is one that would affect the outcome of the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To set up a factual issue, the party opposing summary judgment "must proffer countering evidence sufficient to create a genuine factual dispute." *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987).

When we decided to address Count I, the so-called "illegal contract" argument, the parties seemed to agree that this claim involves no factual disputes. The April 15, 2005, CSUF, however, is replete with objections. Of these, many are simply objections to characterizations or interpretations and are not necessarily disputes as to material facts.

The apparent disputes center on statutory compliance. The Government argues first that the statute provides no relief to Plaintiff and, as a fall-back, that the Navy had "substantially complied" with those requirements imposed by law and regulation. With respect to the first argument, at least, there is no factual dispute—the Plaintiff's ability to invoke the multiyear contract statute for the relief it seeks is purely a question of law. In arguing that the Navy "substantially" complied with the finding requirement, the Government points to an unsigned, undated, handwritten document which, it argues, satisfies the subsection (h) finding. The Government contends it is in the handwriting of Mr. Ed Cahill, a branch chief for the procuring activity. CSUF 18–21. Plaintiff disputes these facts sufficiently to create a material dispute. *Id.* In any event, because we conclude that Plaintiff has no right of action as regards violation of this statute, we need not address the Government's theory of substantial compliance.

Finally, the Government argues that we should deny relief because Gould has failed to demonstrate that it was prejudiced by the violation of the statute and, in any event, that it waived the error by failing to raise it earlier in the acquisition process. Once again, we are not required to reach these

issues given our disposition of the Government's primary theory.

## II. PROCEDURAL REQUIREMENTS FOR MULTIYEAR CONTRACTS

The gist of Plaintiff's claim is that the procurement contract entered into between the Navy and Gould violated the multiyear contract amendments of Section 909 of the 1982 Defense Authorization Act, as well as DoD procurement policy and regulations. We set out the whole of Section 909 as Appendix A. As we alluded to earlier, the statute added a new subsection which required findings by the "head of an agency" before adopting a multiyear contract. We quote that provision in its entirety:

To the extent that funds are otherwise available for obligation, the head of an agency may make multiyear contracts ... whenever he finds—

(A) that the use of such a contract will promote the national security of the United States and will result in reduced costs under the contract;

(B) that the minimum need for the property to be purchased is expected to remain substantially unchanged during the contemplated contract period in terms of production rate, and total quantities;

(C) that there is a reasonable expectation that throughout the contemplated contract period the Department of Defense will request funding for the contract at the level required to avoid contract cancellation;

(D) that there is a stable design for the property to be acquired and that the technical risks associated with such property are not excessive; and

(E) that the estimates of both the cost of the contract and the anticipated cost avoidance through the use of a multiyear contract are realistic.

*See* 10 U.S.C.A. § 2306(h)(1) (1982).

The statute also directs: "The Secretary of Defense shall prescribe defense acquisition regulations to promote the use of multiyear contracting as authorized by paragraph (1) in a manner that will allow the most efficient use of multiyear contracting." 10 U.S.C.A.

§ 2306(h)(2) (1982). Pursuant to this provision DoD adopted DAR § 1–322.1(d) in order to implement the multiyear procurement statute. The regulatory language essentially mirrors that in the statute, expressing the the statutory requirements for entering into multiyear contracts as so many "limitations." The DAR also adds a requirement not detailed by the statutory provision, namely that the findings be made in writing by the Secretary or his designee. The pertinent section of the regulation appears below:

(d) *Limitations.* Multiyear contracts for property and services shall not be used:

\* \* \* \* \* \*

(4) In the case of property, *until a written determination has been made by the Secretary or his designee that:*

(i.) the use of such a contract will promote the national security of the United States and will result in reduced costs under the contract;

(ii.) the minimum need for the property to be purchased is expected to remain substantially unchanged during the contemplated contract period in terms of production rate, and total quantitie

(iii.) there is a reasonable expectation that throughout the contemplated contract period the Department of Defense will request funding for the contract at the level required to avoid contract cancellation;

(iv.) there is a stable design for the property to be acquired and that the technical risks associated with such property are not excessive;

(v.) that the estimates of both the cost of the contract and the anticipated cost avoidance through the use of a multiyear contract are realistic.

DAR § 1–322.1(d)(4)(i)–(v) (emphasis added). The DAR provision also sets out policy considerations to be evaluated in deciding to use multiyear contracts, and a limitation for multiyear property contracts to be fixed price contracts only. DAR 1–322.1(b)(1) and (2). This limitation might operate to preclude a cost-reimbursement remedy under Count I. The DAR provisions on multiyear contract-

ing for the pertinent time period are included as Appendix B.

## III.  STABLE DESIGN GUARANTEE

Plaintiff claims the Navy violated the statute and regulation in failing to make the required findings, especially the findings of "stable design." *See* 10 U.S.C.A. § 2306(h)(1)(D);  DAR  § 1–322.1(d)(4)(iv). The Plaintiff also contends that the statute must be read to *guarantee* a stable design, a guarantee that exists over and above the required findings that a stable design exists. The Government denies any such statutory implication.  However, in arguing its fallback contention of "substantial compliance," it also asserts there was, in fact, a stable design for the Bancroft radio.  At oral argument, the parties offered radically different definitions of "stable design," but without recourse to any then-existing statutory or regulatory authority.  No definition was included in their briefs.

Unable to anchor this "guarantee" in any statutory or regulatory text, Plaintiff asserts simply that it is implied in the statutory scheme.  This view follows naturally from Plaintiff's construction of the provision as one intended for the benefit of the contractor. We are unwilling to recognize such an important and far-reaching statutory right in the absence of any mention in the law's text or in its legislative history.

The law ensures nothing more or less than that certain high officials are accountable for the decision to commit agency procurement funds for long-term contracts.  Compliance with 10 U.S.C. § 2306(h)(1)(D) is not tied to any guarantee of stable design or of any of the other "findings."  Nor are there any provisions in the statute that provide remedies to either the procuring agency or the contractor if it is later determined that any of the Secretary's required findings were made in error.  As we discuss below, the findings requirement is but one means by which Congress exercises oversight of the Executive Branch in the procurement process.

## IV.  INTENDED BENEFICIARY

In order for a contractor to assert a claim founded in a statutory violation, the Plaintiff must show that the provision was intended by Congress for the benefit of the contractor.  Or, framed in the negative, a contractor may not rely on the violation of a provision intended for the benefit of the government.

The principle was expressed most succinctly by the Court of Appeals in *Cessna Aircraft Co. v. Dalton,* 126 F.3d 1442 (Fed. Cir.1997), *cert. denied,* 525 U.S. 818, 119 S.Ct. 57, 142 L.Ed.2d 44 (1998):

> We must still determine whether the provision is a binding regulation, whose breach a contractor may assert against the government.  The primary benefit of a statute or regulation must be to protect or benefit a class of persons in order for that class to be able to bring suit against the government for violating the statute or regulation.
>
> *      *      *      *      *      *
>
> [I]f the primary intended beneficiary of a statute or regulation is the government, then a private party cannot complain about the government's failure to comply with that statute or regulation, even if that party derives some incidental benefit from compliance with it.

*Id.* at 1451–52 (citations omitted).  In other words, there is no right of the contractor to enforce what "is best described as internal operating provision[s] for the management of funds within the agency." *Id.* at 1452.  The obvious extension of that principle is that a contractor may not rely upon a statute which supplies no private cause of action—where enforcement is intended through Congressional oversight.  The case of *American Telephone and Telegraph Co. v. United States,* 307 F.3d 1374 (Fed.Cir.2002) (*AT & T VI* ), authored by Circuit Judge Rader, applies the concept in a case very similar to this one.  We address the conclusions reached by *AT & T* in detail in the pages that follow.

We conclude that several independent analyses each answer this question contrary to the Plaintiff.  We discuss in turn the text of the statute and its legislative history, and

review other cases considering the same point. Finally, we reject the Plaintiff's argument that the matter has already been settled in its favor by the Circuit Court, and is now the "law of the case."

## A. *Express Legislative Intent*

■ As we shall see, prior cases have had to infer legislative intent from the text of the statutory provision or its legislative history. Here our task is much simpler. In looking at the stated goals of this legislation, there is really little room for interpretation in determining the intended beneficiary. The "Declaration of Policy" that precedes all of the provisions of Section 909 of the 1982 DoD Authorization Act states:

> The Congress finds that *in order to ensure national defense preparedness, to conserve fiscal resources, and to enhance defense production capability, it is in the interest of the United States* to acquire property and services for the Department of Defense in the most timely, economic, and efficient manner. It is therefore the policy of the Congress that services and property (including weapon systems and associated items) for the Department of Defense be acquired by any kind of contract, other than cost-plus-a-percentage-of-cost contracts, but including multiyear contracts, *that will promote the interest of the United States.* Further, it is the policy of the Congress that such contracts, when practicable, provide for the purchase of property at times and in quantities that will result in reduced costs to the Government and provide incentives to contractors to improve productivity through investment in capital facilities, equipment, and advanced technology.

Pub.L. No. 97–86, § 909(a)(1) (emphasis added); 10 U.S.C. § 2301(a)(1) (1982). As Judge Rader suggested in Gould I, "[t]his language shows that Congress intended to promote efficiency in Government contracting policies at DoD." *Gould I,* 19 Cl.Ct. at 266. Plaintiff cites the concluding phrase respecting contractor incentives, but at most, it makes contractors incidental beneficiaries. At two points in this declaration of Congress, there is a clear statement of the intended beneficia-

ry in the words "interest of the United States." A fair reading could not conclude otherwise than the statutory recognition and authorization for multiyear contracting is founded on that objective. The individual contractor is not the intended beneficiary of this statutory grant of authority and its limitations and prerequisites. Our search for the congressional intended beneficiary need go no further.

## B. *Statutory Language*

### (i.) Section 2306(h)(1)(A)-(E)

In its effort to establish the contractor as the intended beneficiary of the findings prerequisite, Plaintiff focuses on one subsection of one provision: The requirement for a finding "that there is a stable design for the property to be acquired and that the technical risks associated with such property are not excessive." 10 U.S.C. § 2306(h)(1)(D). The other findings have nothing to do with contractor interests, at least not directly. Plaintiff made no effort to claim it was the beneficiary of findings as to the promotion of national security, requirements, funding, and the accuracy of cost-savings estimates. Once again, we never got a satisfactory definition of "stable design." Yet from all that we have read and heard during the oral argument on this matter, we can hazard a general description. The contractor has a clear idea of anticipated costs of producing the item. Likewise, the Government has a concise picture of the continued usefulness of the product and can be assured that it will not become outmoded, and that once fielded only minimal upgrades to the product will be needed.

Certainly nothing in this characterization of stable design translates the concept into one that is meant solely or even primarily to benefit the contractor. And the actual requirement of the statutory provision is the "finding" itself, not a guarantee of stable design. In fact, read in the context of the surrounding provisions, the provision at issue, Section 2306(h)(1)(D), was meant for the protection of the Government and not the Plaintiff. Each of the five required findings relates to the choice of multiyear procurement, and are directed toward promoting

reliability and cost-savings in defense contracting. *See* 10 U.S.C. § 2306(h)(1)(A) (use of multiyear contract will promote national security and "will result in reduced total costs under the contract"); 10 U.S.C. § 2306(h)(1)(B) (that the "minimum need for the property ... is expected to remain substantially unchanged during contemplated period ..."); 10 U.S.C. § 2306(h)(1)(C) ("there is a reasonable expectation that throughout the contemplated contract period the DoD will request funding ... at the level required to avoid contract cancellation"); and 10 U.S.C. § 2306(h)(1)(E) ("estimates of both the cost of the contract and the anticipated cost avoidance through the use of a multiyear contract are realistic.")

The "stable design" determination—as well as the other findings required by Section 2306(h)(1)—is intended to ensure sound practical procurement decisions. This goal is consistent with the obligation of any Government agency in any program to protect the fisc. The principle aim of the requirements is precisely that of the procurement statute involved in the *AT & T* case. The statutes mandate that approvals and procedural safeguards be put in place for certain types of contracts that expose the military service to procurement risks.

(ii.) Related Provisions

Viewed in its entirety, Section 909 expands the ability of the armed services to enter into multiyear contracts, while providing various degrees of Congressional oversight to ensure that the head of the military department is accountable when the agency does so. This is confirmed in sections of the law other than those pertaining to the required findings by the "head of an agency." For instance, one of the major goals of the Senate bill was to increase the ceiling in cancellation clauses in multiyear contracts. House Rpt. at 124–25. As with the Section 2306(h)(1) findings, there is an element of direct Congressional oversight. For contracts with cancellation ceilings in excess of $100 million, there is a requirement to notify the Senate and House Committees on Armed Forces and Appropriations. 10 U.S.C. § 2306(h)(3).

(iii.) Defense Acquisition Regulations and Policy

The regulatory implementation of the law is likewise intended for the immediate benefit of the procuring agency, and ultimately for the interest of national security. The statute directs the Secretary of Defense to "prescribe defense acquisition regulations to promote the use of multiyear contracting as authorized by paragraph (1) in a manner that *will allow the most efficient use of multiyear contracting.*" 10 U.S.C. § 2306(h)(2)(A) (emphasis added). We refer the reader to our prior summary of those provisions and to Appendix B where those regulations are reprinted in full.

As in the present case, the *AT & T* plaintiff had also alleged that the Navy failed to comply with a variety of procurement regulations pertaining to the selection of contract type. The Court characterized the regulations at issue as "directives [that] provide only internal governmental direction." *AT & T VI*, 307 F.3d at 1380. "Like [the statutory provision]" the Court held, "these provisions supply no remedy for private parties in a judicial form." *Id.* The same must be said about the written approvals required by the DAR and other official policy guidance on multiyear procurement.

Moreover, the regulation once again supports the conclusion that the multiyear statute is not intended to benefit Plaintiff. *See, e.g.,* 10 U.S.C. § 2306(h)(2)(B) ("Such regulations may provide for cancellation provisions in such multiyear contracts *to the extent that such provisions are necessary and in the best interests of the United States.*") (emphasis added.) In the wake of the new regulations, the Chief of Naval Material issued the following:

Department of Defense policy requires that supplies and services be acquired in the most economical manner consistent with sound management. Thus, planning for the acquisition of such supplies and services should always consider contracting alternatives that will capture the economies of long term program stabilization with minimum disruption and risk; will result in reduced costs to the Government; and will provide incentives to contractors

to improve productivity through investment in capital facilities, equipment, and advanced technology. For instance, contracts for quantity production should be structured and funded to benefit from economies of scale and economic production lots where such economies can be attained at an acceptable level of risk to both the Government and the contractor.

Memorandum from Chief of Naval Material, Subject: Expedited Departmental DAR Implementation: Expanded Multiyear Procurement (Mar. 4, 1982).

Plaintiff cites this very memorandum for the proposition that the limitations of Section 2306(h) "benefit the contractor through added protections and incentives." Pl. Br. at 8, n. 7. This same "incentives" language is in the declaration of policy which we cited at the outset of this section. The policy underlying the Defense Authorization Act is to expand the industrial base and improve productivity in defense contracting. This cannot be accomplished without providing incentives to contractors. The statute and regulations may create incentives, but whatever incidental benefits arise for contractors, will ultimately benefit the *intended* beneficiaries of the Defense Authorization Act—DoD, the military departments, and national defense.

The multiyear procurement provisions requiring agency-level approvals foster good business practices by the Government. The required findings under the multiyear procurement provision force the agency to consider the factors which militate against a long-term contractual commitment. Exposing the taxpayer to unnecessary risk by ignoring these factors in procuring defense-related items is bad procurement. But the Navy's disregard of Section 2306(h) does not give the contractor the occasion to seek relief from a failed contract.

### C. *Legislative History*

The dissenting opinion in the *en banc* decision in *AT & T* criticized the majority for resorting to legislative history where the statute was unambiguous. *AT & T IV*, 177 F.3d at 1381–82 (Plager, J., dissenting). The statutory purpose of the multiyear contract law is likewise clear and the parties agree we need go no further. So we feel somewhat reluctant to belabor the point. Still the legislative history is worth addressing, if for no other reason than because Plaintiff insisted at oral argument that this law was an intended boon to contractors despite the absence of any language in the statute confirming this postulate.

Trial Judge Rader found with respect to Section 2306 no evidence in the legislative history of the statute supporting Plaintiff's claim that it was the intended beneficiary of the law. *Gould I*, 19 Cl.Ct. at 266–67. We find the contrary is true—the history is replete with references to governmental interests. The legislative history of the statute speaks in terms of "providing a general policy for the procurement of property and services" which gives the military departments additional tools with which to procure those items needed to accomplish their defense missions.

Reading the testimony of then Secretary of Defense Casper Weinberger during the mark-up of this legislation in Spring 1981—quoted extensively in *Gould I*, 19 Cl.Ct. at 266–67—we were reminded of the era in which this Authorization Act was passed, the era of increased defense spending and build-up in the first year of the Reagan Administration. In his testimony, the Secretary of Defense urges passage of the multiyear contract law so that:

savings and other advantages may be achieved, through improved economies and efficiencies in the production processes, better utilization of industrial facilities, enhanced attractiveness of and competition for Government requirements, and a reduction of the administrative burden in the placement and administration of contracts.

Hearing on Multiyear Procurement, Armed Services Committee, U.S. House of Representatives, 97th Cong., 1st Sess., 6 (1981).

Likewise, the Conference Report states:

Under the guidelines of the policy . . . property and services for the Department of Defense could be acquired by any kind of contract, other than cost-plus-a-percentage-of-cost contracts, but including multi-

year contracts, *that would promote the interest of the United States.*

House Report No. 97–311, 124, 3 U.S. Cong. & Adm. News 1865 (1981) (emphasis added.) According to the Report the amendments would:

provide for the purchase of property at times and in quantities that would result in reduced cost to the government, provide incentives to contractors to improve productivity through investment, and provide for achievement of economic-lot purchases and efficient production rates.

*Id.*

### D. *AT & T and Related Case Law*

When we move from the consideration of our statute and consider relevant case law, we find our conclusion is confirmed. This is best illustrated in the decisions of the Federal Circuit in the previously mentioned *AT & T* case, specifically the *en banc* reconsideration of its earlier holding on a certified matter, *AT & T v. United States*, 177 F.3d 1368 (Fed.Cir.1999) (*AT & T IV*), and the follow-up application of that decision by a panel decision in a subsequent appeal, *AT & T v. United States*, 307 F.3d 1374 (Fed.Cir.2002) (*AT & T VI*), authored by Judge Rader.

*AT & T* also involved allegations that the U.S. Navy violated a procurement provision and various procurement regulations and directives. The statutory provision at issue in *AT & T* was Section 8118 of the 1987 DoD Appropriations Act. The provision prohibited the military service from obligating funds for certain fixed-price contracts:

unless the Under Secretary of Defense for acquisition determines, in writing, that program risk has been reduced to the extent that realistic pricing can occur, and that the contract type permits an equitable and sensible allocation of program risk between contracting parties ...

Pub.L. No. 100–202, § 8118, 101 Stat. 1329, 1329–84 (Dec. 22, 1987). The provision also prevented the delegation of this responsibility below Assistant Secretarial level, and:

[p]rovided further, that the Under Secretary report to the Committees on Appropriations of the Senate and House of Representatives in writing, on a quarterly

basis, the contracts which have obligated funds under such a fixed price-type developmental contract.

*Id.* The Navy contracted with AT & T for the procurement of an undersea radar system, but in doing so the Navy made none of the findings required by Section 8118, and did not report the contract to the Appropriations Committees.

The trial court certified whether the violation of Section 8118, undermined the Navy's authority to enter into a contract and thus rendered it void *ab initio.* The Court of Appeals held *en banc* that the Navy's "noncompliance with the supervisory and reporting instructions" in the statute did not invalidate the contract or render it void.

*AT & T IV,* 177 F.3d at 1375. In arriving at this conclusion, Judge Newman, writing for the majority of the Court, held:

Congress can not have intended to charge the contracting partner with the adverse consequences [of the agency's "imperfect compliance" with § 8118] depending on whether the Defense Department carried out the internal responsibilities and filed the reports that Congress required.

Nor is it the judicial role to discipline the agency's noncompliance with supervisory and reporting instructions of congressional oversight.

*Id.* (citations omitted).

The Court relied upon clear legislative intent confirming that the written findings and reporting required by Section 8118 "serves the government interests in the long-term health of the defense industry, and *that this section not be used as the basis for litigating the propriety of an otherwise valid contract.*" *Id.* (quoting S.Rep. No. 100–326, 100th Cong., 2d Sess. at 105 (1988)) (emphasis supplied by Court).

Upon remand, the Court of Federal Claims held that the procurement violations were not actionable by the plaintiff, insofar as Congress intended no "protectable interest in the proper application of Section 8118." *AT & T v. United States,* 48 Fed.Cl. 156, 160 (2000) (*AT & T V*). Indeed, this Court had described the Navy's noncompliance with the

internal certification and reporting procedures of Section 8118 as "simply a failure to abide by housekeeping rules." *Id.* Put another way, the violated statutory provision was intended primarily for the government's benefit and thus gave the contractor no right to enforce it. *See id.* (citing *Cessna Aircraft Co.,* 126 F.3d at 1451–52).

In its second application of the law to these facts, the U.S. Court of Federal Claims was upheld by the Federal Circuit in an opinion authored by Judge Rader. In *AT & T VI,* Judge Rader characterized the law requiring certain findings for funding fixed-price contracts as an appropriations oversight provision. *AT & T VI,* 307 F.3d at 1378. The Court stressed that enforcement of that statute was limited to "the 'supervisory role' of the legislative branch." *Id.*

Plaintiff argues that our statute and its implementing regulations do not fall under the *AT & T* rule. The multiyear contract provision, it claims, is intended to limit the risks associated with fixed-price contracts. Consequently, Gould argues, the contractor is an intended beneficiary of Section 2306(h), and can enforce the provision. We have been unable to find any indication in these sources that the multiyear contract provision was prompted by a concern over fixed-price contracting. Indeed except for the limitation in the DAR that confines multiyear contracting to fixed-price contracts—a limitation the parties did not discuss—we have not discovered and the parties have not pointed to the mention of fixed-price contracts in the statute or regulations.

Plaintiff also attempts to distinguish the *AT & T* case. It involved a reporting requirement. Therefore, argues Plaintiff, it was clear that Congress intended no judicial enforcement of the law. Gould claims that this case is different, that the statute is not purely a Congressional oversight measure. Both statutes contain an unexecuted supervisory requirement, the "findings" or "determinations." The Court's focus on the reporting requirement does not impair *AT & T's* precedential value.

The language of our statute and its legislative design are indistinguishable from that of Section 8118. The particular statutory violation complained of in *AT & T* was not the reporting requirement; it was the failure of the Under Secretary of Defense to make required determinations as to program risk and realistic pricing. *AT & T VI,* 307 F.3d at 1377. This type of violation is no different than the Navy's failure to make the findings required by Section 2306(h)(1).

It is true that the *AT & T* case focuses on the reporting nature of the requirements as evidence that enforcement of the congressional rules would be accomplished by the oversight function. This aspect of the opinion does not change our view of Section 2306(h)(1). Reporting is not the only way Congress seeks to enforce its rules. It also does so by requiring that critical decisions—findings—be made by senior officials. This is true in both Section 2306(h) (*Gould*) and Section 8118 (*AT & T*). Testimony of the Secretary of Defense before the House Committee on Armed Services confirms the understanding this was indeed intended as an oversight provision. As Secretary Weinberger observed, it "provides for *appropriate oversight by Congress* over the use of multiyear procurement on large dollar value contracts." Hearing on Multiyear Procurement, Armed Services Committee, U.S. House of Representatives (June 23, 1981).

Therefore, the rationale of *AT & T* applies with equal force here: it is not the role of the courts "to discipline the agency's noncompliance with the supervisory and reporting instructions of congressional oversight." *AT & T IV,* 177 F.3d at 1375 (citations omitted.) The *AT & T* case confirms the principle that contractors cannot avail themselves of a statute that is intended primarily for the benefit of the Government, or one which comprehends enforcement solely in the Legislative Branch pursuant to its oversight powers. Section 2306(h)(1) was just that, an oversight measure with the goal of ensuring that multiyear contracts serve the interests of the United States.

E. *Other Case Law*

Contractors may not rely on violations which pertain to what has been variously described as agency operating procedures,

house-keeping rules, or internal Government direction. The *AT & T* case is not the only authority we may look to in order to determine what kinds of statutory violations support a contractor claim.

The Court of Appeals decision in *Cessna Aircraft* speaks to this issue. Without gaining the proper authority to do so, the Navy deviated from a Cancellation of Items clause that was mandatory for all multiyear contracts. The contractor argued that the Navy's "late" election of the option year was invalid because the Navy had not gotten the proper authorization to extend the time. The Circuit Court held that the "primary purpose behind the Cancellation of Items clause is to protect the government's interest by encouraging government officials to monitor availability of funds for each fiscal year and to provide notice to contractors accordingly." *Cessna Aircraft Co.,* 126 F.3d at 1454. As such, the Plaintiff "may not rely on the deviation in arguing the Navy's exercise of options [under the contract] was ineffective." *Id.* at 1455. At most, the contractor in *Cessna* was an incidental beneficiary of the statute and, therefore, had no recognizable interest in enforcing the provisions. *Id.* at 1451–52, 1454–55.

We may also look to other cases in an effort to determine which statutory or other violations have been recognized as benefitting the contractor and which do not. The parties each cite the same group of cases to support their opposing positions. In each of these cases, the Court found the violation to be actionable by the contractor. And, invariably, the asserted violation had to do with an improper price adjustment clause or otherwise had to do with the contractor's compensation. *See, e.g., Beta Sys. Inc. v. United States,* 838 F.2d 1179 (Fed.Cir.1988) (contractor subjected to economic price adjustment index in violation of the DAR); *LaBarge Prods., Inc. v. West,* 46 F.3d 1547 (Fed.Cir.1995) (contractor's bid price artificially increased due to improper auction); *Urban Data Sys., Inc. v. United States,* 699 F.2d 1147 (Fed.Cir.1983) (illegal price adjustment clause); *Applied Devices Corp. v. United States,* 219 Ct.Cl. 109, 591 F.2d 635 (1979) (improper cancellation ceiling); *Chris Berg,*

*Inc. v. United States,* 192 Ct.Cl. 176, 426 F.2d 314, 317–318 (1970) (contractor prohibited from correcting mistaken bid).

Since the improper clause or proscribed activity operated directly to the detriment of the contractor, clearly the violated provision had been intended for plaintiffs' protection. Manifest in each of these cases is the principle that in order to pursue a legal remedy for the violation, the particular procurement provision at issue must directly benefit the contractor.

By contrast, *AT & T, Cessna,* and a trial opinion in an "illegal contract" case, *Northrop Grumman Corp. v. United States,* 47 Fed.Cl. 20 (2000), each involved the failure to make findings, or to satisfy some other internal operating requirement of no particular direct concern to the contractor. One case, in particular, was emphasized by counsel for Plaintiff during oral argument—*Urban Data Systems.* As Judge Miller noted in distinguishing this same case, *Urban Data Systems* involved an illegal price term, whereas the illegality alleged in her case arose from the government's failure to perform a risk determination. *Northrop Grumman,* 47 Fed.Cl. at 40 n. 6.

## V. LAW OF THE CASE

Finally, Plaintiff argues that this debate has already been settled, and that the viability of its "illegal contract" claim under Section 2306(h)(1)(D) is firmly established law of the case in *Gould II,* and later confirmed in *Gould IV.*

The law of the case doctrine provides that the decision, judgment, opinion or rulings on a former appeal become the law of the case in further trial proceedings. It binds trial courts like this one, and prevents the relitigation of issues that have been decided on appeal in the same matter. *See Gould IV,* 67 F.3d at 930. The purpose of the doctrine is to promote finality, a matter which obviously concerned the Court of Appeals in its most recent decision on a matter that it deemed to be settled—whether Gould's allegations sufficed to state a claim under Rule 12. To assess Plaintiff's argument, we must take a close look at the earlier opinions, *Gould I* and *Gould II,* in particular.

As the first trial judge in this matter, *in Gould I* Judge Rader dismissed all Counts for failure to state a claim. Among the conclusions reached by Judge Rader was that the multiyear procurement restrictions in Section 2306(h) were intended to benefit the Government as opposed to private contractors. *Gould I,* 19 Cl.Ct. at 266. In fact, there is little need to improve upon his reasoning. Judge Rader traced the legislative history of the statute and distinguished the very same cases upon which Plaintiff now relies. He later memorialized this view as the principal author of *AT & T VI.* We take more than passing comfort in the fact that Judge Rader came to the same substantive conclusion we have. But according to Plaintiff, we must reject Judge Rader's conclusions, given the subsequent treatment of the case on appeal, upon remand, and in the second appeal.

Gould's argument may be summarized as follows: *Gould I* held that Section 2306(h)(1) was enacted for the benefit of the Government and not for the contractors; the Federal Circuit vacated that opinion in *Gould II,* thereby reversing Judge Rader's conclusion as to Count I and establishing its opposite. The law of the case principles, therefore, foreclose this Court from revisiting the "holding" of the Court of Appeals.

Judge Rader's *Gould I* decision was indeed vacated by the Federal Circuit. *See Gould II,* 935 F.2d at 1271. Plaintiff clouds the issue with respect to precisely which aspects of the Court's decision in *Gould I* were explicitly reversed. With its remand, the Court of Appeals did not rule that the statute gave Plaintiff a valid cause of action. The Federal Circuit's decision was far more limited in its reach.

First, the "intended beneficiary" theory was initially presented as "an alternative theory for recovery." *Gould I,* 19 Cl.Ct. at 265. And it was treated by the trial court as an alternative holding. *See id.* at 269. This theory was addressed by the trial court only after it determined that reformation was not an appropriate form of relief for the particular claims asserted by Gould. The Court's primary holding respecting the "illegal contract" claim was that the equitable remedy of reformation was not available because Gould could not demonstrate: (1) that the Government received a benefit from Plaintiff's performance; or (2) that the illegality was not plain. *Gould I,* 19 Cl.Ct. at 264–65. The Court of Appeals reversed *Gould I* on this holding. *See Gould II,* 935 F.2nd at 1275.

The Federal Circuit also faulted the Claims Court for construing the facts underlying the substantive counts in the procedural posture of a Rule 12 motion, "contrary to the standard for considering a motion for dismissal." *Id.* The Court of Appeals noted that Judge Rader apparently did not accept the facts pled as true for purposes of a motion under Rule 12(b)(4). Likewise, with respect to the remaining counts of Plaintiff's Complaint, the basis for vacating the dismissal was the Court of Appeals' *de novo* conclusion that those allegations met the liberal standards for notice pleading. *Id.* at 1275–76. The "law of the case," therefore, is that these allegations survive a motion to dismiss for failure to state a claim upon which relief can be granted. Whether the merits of those very same claims survive summary judgment is an entirely different and undecided matter. In vacating Judge Rader's decision, the Circuit Court did not mention, much less address and reject, the trial court's alternative theory of intended beneficiary.

Similarly, the Court of Appeals, in the most recent appeal of this case, did no more than reject Judge Sypolt's conclusion that subject matter jurisdiction was lacking. *See Gould III,* 29 Fed.Cl. 758. It did not, as Plaintiff suggests, rule on the substantive issue of whether the multiyear contracting statute provides a valid cause of action for Gould. This issue, which is necessarily linked to the "intended beneficiary" principles, was beyond the scope of the issues decided in *Gould IV. Accord, Northrop Grumman Corp. v. United States,* 63 Fed.Cl. 38, 44–45 (2004) (In rejecting plaintiff's reliance on *Gould IV* to escape the precedential effect of *AT & T,* Judge Horn ruled that the Federal Circuit's opinion in *Gould IV* did not review the language or legislative history of multiyear contracting with respect to the controlling issue of whether a private cause of action was intended by Congress, as opposed to legislative oversight for violations of the statute.).

Finally, we note that *Gould I–IV* were decided before the Federal Circuit's careful analysis of this issue in *AT & T.* As we have seen, that precedent clearly prevents contractors from relying upon statutes aimed primarily at governmental functions and enforced through Congressional oversight. The Court of Appeals in *AT & T* merely applied established principles of statutory interpretation and separation of powers in finding that the violation of a particular provision in an appropriations statute gave no private right of action to the contractor. There is no suggestion that the Federal Circuit came to a "contrary decision" in *AT & T* than it had earlier in either *Gould II* or *Gould IV.* Rather the Court of Appeals in these prior decisions came to *no* conclusion *on this issue.* Accordingly, we do not today "reopen what has already been decided." *Gindes v. United States,* 740 F.2d 947, 949 (Fed.Cir.1984) (quoting *Messinger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912)). We have simply applied the law as it has been established by binding precedent to an issue not yet decided.

### CONCLUSION

Our conclusion that Gould may not avail itself of any alleged violation of Section 2306(h)(1) obviates the need to address the subsidiary claims of the parties.

Accordingly, **we find in favor of the Government on Count I of the Complaint. We hereby deny Plaintiff's motion for partial summary judgment and grant Defendant's cross-motion. The parties shall file a Joint Status Report no later than August 15, 2005,** proposing a schedule for further proceedings on the remaining counts of Plaintiff's Complaint.

**IT IS SO ORDERED.**

APPENDIX A

**PUBLIC LAW 97–86 [S. 815]; December 1, 1981**

**DEPARTMENT OF DEFENSE AUTHORIZATION ACT, 1982**

*For Legislative History of Act, see p. 1781*

An Act to authorize appropriations for fiscal year 1982 for the Armed Forces for procurement, for research, development, test, and evaluation, and for operation and maintenance, to proscribe personnel strengths for such fiscal year for the Armed Forces and for civilian employees of the Department of Defense to authorize appropriations for such fiscal year for civil defense, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Department of Defense Authorization Act, 1982".

Department of Defense Authorization Act, 1982

### TITLE 1—PROCUREMENT

### AUTHORIZATION OF APPROPRIATIONS

SEC. 101. Funds are hereby authorized to be appropriated for fiscal year 1982 for the use of the Armed Forces of the United States for procurement of aircraft, missiles, naval vessels, tracked combat vehicles, torpedoes, and other weapons in amounts as follows:

### AIRCRAFT

For aircraft: for the Army, $1,910,200,000; for the Navy and the Marine Corps, $9,302,500,000; for the Air Force, $13,773,698,000, of which $1,801,000,000 is available only for procurement of long-range combat aircraft.

### MISSILES

For missiles: for the Army, $2,146,900,000; for the Navy, $2,567,000,000; for the Marine Corps, $223,024,000; for the Air Force, $4,186,846,000.

### NAVAL VESSELS

For naval vessels: for the Navy, $8,795,900,000.

## TRACKED COMBAT VEHICLES

For tracked combat vehicles: for the Army, $3,251,200,000; for the Marine Corps, $281,739,000.

## TORPEDOES

For torpedoes and related support equipment: for the Navy, $516,600,000.

## OTHER WEAPONS

For other weapons: for the Army, $655,400,000; for the Navy, $200,200,000; for the Marine Corps, $136,344,000; for the Air Force, $3,047,000.

95 STAT. 1099

LAWS OF 97TH CONG.—1st SESS.

P.L. 97-86

"(b) Subsection (a)(5) does not include procurement of automatic data processing equipment or services to be used for routine administrative and business applications (including payroll, finance, logistics, and personnel management applications)."

(2) The table of sections at the beginning of such chapter is amended by adding at the end thereof the following new item:

"2315. Law inapplicable to the procurement of automatic data processing equipment and services for certain defense purposes.".

(b) Section 2315 of title 10, United States Code, as added by subsection (a), does not apply to a contract made before the date of the enactment of this Act.

Restrictions 10 USC 2315 note.

### MULTIYEAR PROCUREMENT

SEC. 909. (a) Section 2301 of title 10, United States Code, is amended—

(1) by striking out "It is" and inserting in lieu thereof "(b) It is also"; and

(2) by inserting after the section heading the following:

Contracts

"(a)(1) The Congress finds that in order to ensure national defense preparedness, to conserve fiscal resources, and to enhance defense production capability, it is in the interest of the United States to acquire property and services for the Department of Defense in the most timely, economic, and efficient manner. It is therefore the policy of the Congress that services and property (including weapon systems and associated items) for the Department of Defense be acquired by any kind of contract, other than cost-plus-a-percentage-of-cost contracts, but including multiyear contracts, that will promote the interest of the United States. Further, it is the policy of the Congress that such contracts, when practicable, provide for the purchase of property at times and in quantities that will result in reduced costs to the Government and provide incentives to contractors to improve productivity through investment in capital facilities, equipment, and advanced technology.

"(2) It is also the policy of the Congress that contracts for advance procurement of components, parts, and materials necessary for manufacture or for logistics support of a weapon system should, if feasible and practicable, be entered into in a manner to achieve economic-lot purchases and more efficient production rates.".

(b) Section 2306 of such title is amended—

(1) by striking out "to be performed outside the forty-eight contiguous States and the District of Columbia" in subsection (g); and

(2) by adding at the end thereof the following new subsection:

"(h)(1) To the extent that funds are otherwise available for obligation, the head of an agency may make multiyear contracts (other than contracts described in paragraph (6)) for the purchase of property, including weapon systems and items and services associated with weapon systems (or the logistics support thereof), whenever he finds—

"(A) that the use of such a contract will promote the national security of the United States and will result in reduced total costs under the contract;

"(B) that the minimum need for the property to be purchased is expected to remain substantially unchanged during the

contemplated contract period in terms of production rate, procurement rate, and total quantities;

95 STAT. 1118
## DEPARTMENT OF DEFENSE

### Sec. 1

### P.L. 97-86

"(C) that there is a reasonable expectation that throughout the contemplated contract period the Department of Defense will request funding for the contract at the level required to avoid contract cancellation;

"(D) that there is a stable design for the property to be acquired and that the technical risks associated with such property are not excessive; and

"(E) that the estimates of both the cost of the contract and the anticipated cost avoidance through the use of a multiyear contract are realistic.

Regulations

"(2)(A) The Secretary of Defense shall prescribe defense acquisition regulations to promote the use of multiyear contracting as authorized by paragraph (1) in a manner that will allow the most efficient use of multiyear contracting.

"(B) Such regulations may provide for cancellation provisions in such multiyear contracts to the extent that such provisions are necessary and in the best interests of the United States. Such cancellation provisions may include consideration of both recurring and nonrecurring costs of the contractor associated with the production of the items to be delivered under the contract.

"(C) In order to broaden the defense industrial base, such regulations shall provide that, to the extent practicable—

"(i) multiyear contracting under paragraph (1) shall be used in such a manner as to seek, retain, and promote the use under such contracts of companies that are subcontractors, vendors, or suppliers; and

"(ii) upon accrual of any payment or other benefit under such a multiyear contract to any subcontractor, vendor, or supplier company participating in such contract, such payment or benefit shall be delivered to such company in the most expeditious manner practicable.

"(D) Such regulations shall also provide that, to the extent practicable, the administration of this subsection, and of the regulations prescribed under this subsection, shall not be carried out in a manner to preclude or curtail the existing ability of agencies in the Department of Defense to—"

"(i) provide for competition in the production of items to be delivered under such a contract; or

"(ii) provide for termination of a prime contract the performance of which is deficient with respect to cost, quality, or schedule.

Cancellation notification to congressional committees

"(3) Before any contract described in paragraph (1) that contains a clause setting forth a cancellation ceiling in excess of $100,000,000 may be awarded, the head of the agency concerned shall give written notification of the proposed contract and of the proposed cancellation ceiling for that contract to the Committees on Armed Services and on Appropriations of the Senate and House of Representatives, and such contract may not then be awarded until the end of a period of 30 days beginning on the date of such notification.

"(4) Contracts made under this subsection may be used for the advance procurement of components, parts, and materials necessary to the manufacture of a weapon system, and contracts may be made under this subsection for such advance procurement, if feasible and practical, in order to achieve economic-lot purchases and more efficient production rates.

"(5) In the event funds are not made available for the continuation of a contract made under this subsection into a subsequent fiscal

year, the contract shall be canceled or terminated, and the costs of cancellation or termination may be paid from—

"(A) appropriations originally available for the performance of the contract concerned;

"(B) appropriations currently available for procurement of the type of property concerned, and not otherwise obligated; or

"(C) funds appropriated for those payments.

Restrictions

"(6) This subsection does not apply to contracts for the construction, alteration, or major repair of improvements to real property or contracts for the purchase of property to which section 111 of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 759) applies.

"(7) This subsection does not apply to the Coast Guard or the National Aeronautics and Space Administration.

Multiyear contract

"(8) For the purposes of this subsection, a multiyear contract is a contract for the purchase of property or services for more than one, but not more than five, program years. Such a contract may provide that performance under the contract during the second and subsequent years of the contract is contingent upon the appropriation of funds and (if it does so provide) may provide for a cancellation payment to be made to the contractor if such appropriations are not made.".

(c) Section 189(c) of such title is amended—

(1) by striking out "and" at the end of clause (2);

(2) by striking out the period at the end of clause (3) and inserting in lieu thereof "; and"; and

(3) by adding at the end thereof the following:

"(4) the most efficient production rate and the most efficient acquisition rate consistent with the program priority established for such weapon system by the Secretary concerned.".

Regulations and directive modification 10 USC 2301 note.

(d) Not later than the end of the 90–day period beginning on the date of the enactment of this Act—

(1) the Secretary of Defense shall issue such modifications to existing regulations governing defense acquisitions as may be necessary to implement the amendments made by subsections (a), (b), and (c); and

(2) the Director of the Office of Management and Budget shall issue such modifications to existing Office of Management and Budget directives as may be necessary to take into account the amendments made by subsections (a) and (b).

Repeal

(e) Section 810 of the Department of Defense Appropriation Authorization Act, 1976 (Public Law 94–106; 89 Stat. 539), is repealed.

(f) Section 2311 of title 10, United States Code, is amended—

(1) by striking out "(1)"; and

(2) by striking out ", and (2) authorizing contracts in excess of three years under section 2306(g) of this title".

## RESEARCH GRANTS

SEC. 910. Section 2358(1) of title 10, United States Code, is amended by inserting ", or by grant to," after "by contract with".

## MODIFICATION OF DEFENSE CONTRACT PROFIT LIMITATION PROVISIONS

SEC. 911. (a)(1) Section 2382 of title 10, United States Code, is amended to read as follows:

95 STAT. 1120
APPENDIX B

## GENERAL PROVISIONS

1–322   Multiyear Contracting.

1–322.1   *General.*

(a) *Description of Procedure.* Multiyear procurement consists of methods of acquiring DoD planned requirements for up to a .5–year period (4 years in the case of maintenance and operation of family housing), without having total funds for the entire multiyear period available at time of award. Multiyear contract quantities are budgeted for and financed in accordance with the applicable program year as reflected in the DoD Five–Year Defense Program. This method may be used for either competitive or noncompetitive contracting. With respect to competitive contracting, award may be based on price only or price and other factors considered. (See 1–322.4(a)(2).) Multiyear contracts may contain a contract provision allowing reimbursement of unrecovered nonrecurring costs included in prices for canceled items to protect the contractor against loss resulting from cancellation.

(b) *Policy.*

(1) Use of multiyear contracting is encouraged to take advantage of one or more of the following:

(i) lower costs;

(ii) enhancement of standardization;

(iii) reduction of administrative burden in the placement and administration of contracts;

(iv) substantial continuity of production or performance, thus avoiding annual startup costs, preproduction testing costs, make-ready expenses, and phaseout costs;

(v) stabilization of contractor work forces;

(vi) avoidance of the need for establishing and "proving out" quality control techniques and procedures for a new contract each year;

(vii) broadening the competitive base with opportunity for participation by firms not otherwise willing or able to compete for lesser quantities, particularly in cases involving high startup costs;

(viii) implementation of the industrial preparedness program for planned items with planned producers; and

(ix) provide incentives to contractors to improve productivity through investment in capital facilities, equipment, and advanced technology (see 1–315).

(2) Contracts awarded under this multiyear procedure shall be firm fixed price, fixed price incentive or fixed price with provisions for economic price adjustment.

### 1-322.1
## ARMED SERVICES PROCUREMENT REGULATION

### 59
### GENERAL PROVISIONS

(3) Given the longer performance period associated with a multiyear procurement, consideration in pricing contracts should be given to the use of economic price adjustment provisions, profit objectives comparable with risk, and financing arrangements which reflect contractor cash flow requirements.

(4) Before any multiyear contract that contains a clause setting forth a cancellation ceiling in excess of $100 million may be awarded, the Secretary shall give written notification of the proposed contract and of the proposed cancellation ceiling for that contract to the Committees on Armed Services and on Appropriations of the Senate and House of Representatives, and such contract may not then be awarded until the end of a period of 30 calendar days beginning on the date of such notification. Departments shall establish reporting procedures. Copies of the notification shall be submitted to Office of the Secretary of Defense, ODUS-DRE(AM), and Deputy Assistant Secretary of Defense, OASD(C)(P/B). Departments shall also comply with any notification requirements or restrictions contained in annual authorization or appropriation acts.

(5) Multiyear contracting is a flexible contracting method applicable to a wide range of procurements. The provisions of this paragraph 1–322 and the clauses at 7–104.47(b)

and 7–1903.33(b) and (d) may be modified in the following respects:

(i) *Level Unit Prices.* Multiyear contract procedures provide for the amortization of certain costs over the entire contract quantity resulting in identical (level) unit prices (except when economic price adjustment provisions apply) for all items or services under the multiyear contract. When level unit pricing is not in the best interest of the Government, the Head of a Contracting Activity or his designee may approve the use of variable unit pricing, provided that for competitive proposals, there is a valid method of evaluation.

(ii) *Cancellation Provisions.* Whether or to what extent cancellation provisions are used in multiyear procurements will depend on the unique circumstances of each procurement. The Head of a Contracting Activity or his designee may authorize the use of modified cancellation provisions or the exclusion of cancellation provisions from the contract.

(iii) *Recurring Costs in Cancellation Ceiling.* The inclusion of recurring costs in cancellation ceilings is an exception to normal contract financing arrangements and requires approval by the Secretary of Defense or his designee.

(iv) *Annual and Multiyear Proposals.* DAR 1–322.2 prescribes circumstances in which both annual and multiyear bids/proposals or only multiyear bids/proposals will be requested. Obtaining both provides reduced lead time for making an annual award in the event a multiyear award is not in the best interest of the Government. Obtaining both also provides a basis for the computation of savings and other benefits. However, the preparation and evaluation of dual proposals may increase administrative costs and workloads for both offerors and the Government, especially for large or complex procurements. The Head of a Contracting Activity (HCA) or his designee may authorize the use of an IFB or RFP requesting only multiyear prices, provided it is found that such a solicitation is in the best interest of the Government and that dual proposals are not necessary to make the determinations required by 1–322.1(d)(3) or (4).

## 1-332.1
## ARMED SERVICES PROCUREMENT REGULATION

### 60
### GENERAL PROVISIONS

(c) *Use.* The multiyear procurement method may be used for the procurement of services and property (including but not limited to weapons systems and services associated with weapons systems or the logistic support thereof, systems, subsystems major equipment, components, parts, materials, supplies and the advance procurement thereof, and commercial and noncommercial items) to the extent that funds are otherwise available for obligation.

(d) *Limitations.* Multiyear contracts for property and services shall not be used:

(1) When funds covering the acquisition are limited by statute for obligation during the fiscal year in which the contract is executed (but see 1–322.6 for multiyear contracting of specified services, and 1–322.7 for multiyear contracting of supplies and services for the maintenance and operation of family housing.

(2) To obtain requirements which are in excess of the Five–Year Defense Program.

(3) In the case of services, until a written determination has been made by the HCA or his designee that (i) there will be a continuing requirement for the services and incidental supplies, consonant with current plans for the proposed contract period; (ii) the furnishing of such services and incidental supplies will require a substantial initial investment in plant or equipment or the incurrence of substantial contingent liabilities for the assembly, training, or transportation of a specialized work force, or other substantial startup costs; and (iii) the use of such a contract will promote the best interests of the United States by encouraging effective competition and promoting economies of operation.

(4) In the case of property, until a written determination has been made by the Secretary or his designee that:

(i) the use of such a contract will promote the national security of the United States and will result in reduced total costs under the contract;

(ii) the minimum need for the property to be purchased is expected to remain substantially unchanged during the contemplated contract period in terms of production rate, procurement rate, and total quantities;

(iii) there is a reasonable expectation that throughout the contemplated contract period the Department of Defense will request funding for the contract at the level required to avoid contract cancellation;

### 1-322.1
### ARMED SERVICES PROCUREMENT REGULATION
#### 61
#### GENERAL PROVISIONS

(iv) there is a stable design for the property to be acquired and that the technical risks associated with such property are not excessive; and

(v) the estimates of both the cost of the contract and the anticipated cost avoidance through the use of a multiyear contract are realistic.

(e) *Set–Asides.* Total small business set-asides are compatible with the multiyear method of contracting. Partial set-aside procedures (both small business and labor surplus area) are generally not compatible with the multiyear procedure when high startup costs are involved (potential duplication of such costs by the set-aside contractor and the non-set-aside contractor is not offset by broader and more realistic competition). Partial set-asides are compatible when the opportunity for cost savings is based on assurance of continuity of production over longer periods of time. When considering use of this procedure, the contracting officer shall request the activity's small business specialist and the SBA representative, if one is assigned to that activity, to review all pertinent facts and make recommendations thereon.

(f) *Multiyear Subcontracts.* The same benefits and advantages that are derived from multiyear prime contracts may frequently be increased by multiyear subcontracts thereunder. The prime contractor in the exercise of his management responsibilities must freely choose the subcontract types that best satisfy his needs. However, multiyear prime contractors should be encouraged to employ multiyear subcontracts selectively when—

(i) the subcontract item or service is of stable design and specifications;

(ii) the quantity required is reasonably firm and continuing;

(iii) effective competition may be enhanced; and

(iv) the use of multiyear subcontracts can reasonably be expected to result in reduced prices.

Multiyear subcontracts may be particularly desirable under a sole source multiyear prime contract since effective competition at the subcontract level may thereby be enhanced and the attendant cost reductions realized by the prime contractor and the Government.

(g) *Use of Options.*

(1) Options may be used when some future requirements are definite and additional quantities of supplies or services are likely, though not definitive as to amount.

(2) Options to increase quantities or options to renew the contract for a reasonable period shall be priced not to include (i) charges for plant and equipment already amortized or (ii) any other nonrecurring charges that were included in and already recovered under the basic contract price. Any such option provision shall not exceed the period described in 1–1502(e).

### 1-322.1
### ARMED SERVICES PROCUREMENT REGULATION
#### 62
#### GENERAL PROVISIONS

(h) *Funding of Multiyear Contracts.*

(1) The planning and coordination of multiyear acquisition strategies should begin sufficiently early to permit required integration of the acquisition into the Planning Program-

ming and Budgeting System (PPBS). The degree of integration and the extent of data required will vary with the type and size of the program. Guidelines shall be included, as required, in DoD and Service instructions for preparing program objective memoranda (POM) submissions and budget estimate submissions (BES).

(2) Policies and procedures for the funding of procurements within the procurement title of the DoD Appropriation Act are contained in DoD Directive (DoDD) 7200.4, Full Funding of DoD Procurement Programs. Those policies and procedures include the funding of advance procurements (long lead and economic order quantity). Cancellation ceilings containing only nonrecurring costs need not be funded.

1-322.2 *Procedures for Supply and Service Multiyear Contracts.* (See also 1-322.1(b)(5).)

(a) Where competition is anticipated, solicitations shall include:

(1) A statement of the requirements, separately identified for—

(i) the first program year; and

(ii) the multiyear contract including the requirements for each program year thereunder.

(2) When a first program year "buy-in" is not anticipated—

(i) provisions that (A) a price must be submitted for the total requirements of the first program year, (B) a price may be submitted for the total multiyear requirements, and (C) a bid or offer on the multiyear requirements only will be considered nonresponsive; and

(ii) a provision that if only one responsive bid or offer on the multiyear requirements is received from a responsible bidder or offeror, the Government reserves the right to disregard the bid or offer on the multiyear requirements and to make an award only for the first program year requirements.

(3) When competition in future acquisitions would be impractical after award of a contract covering the first program year re-

quirements only, and it is determined that, in order to eliminate the possibility of a first program year "buy-in," the following provisions will be in the best interest of the Government -

(i) provisions that a price may be submitted only for the total multiyear requirements and that prices on a single year basis will not be considered for the purpose of award; and

1-332.2

# ARMED SERVICES PROCUREMENT REGULATION

## 63

### GENERAL PROVISIONS

(ii) a provision that if only one responsive bid or offer on the multiyear requirements is received from a responsible bidder or offeror, the Government reserves the right to cancel the solicitation and resolicit on a single year basis by whatever procedures are then appropriate.

(4) A provision that the unit price of each item in the multiyear requirements shall be the same for all program years (level unit price) included therein.

(5) Criteria for comparing the lowest evaluated submission on the first program year's requirement against the lowest evaluated submission on the multiyear requirements.

(6) Criteria for evaluation factors other than price where the acquisition is on the basis of price and other factors.

(7) When the solicitation requires offers on the first program year requirements and permits offers on the multiyear requirements, a provision that in the event the Government determines prior to award that only the first program year quantities are actually required, the Government may evaluate offers and make award solely on the basis of price offered on the first program year requirements. In such an event, prices offered on a multiyear basis shall not be considered.

(8) A provision setting forth a separate cancellation ceiling (on a percentage or dollar basis) and dates applicable to each program year subject to a cancellation (see (c) below).

(9) A prominently placed provision directing attention to the multiyear features of the solicitation, and to—

(i) the applicable Limitation of Price and Contractor Obligations clause (see 7–104.47(a) or 7–1903.33(c)), which limits the payment obligation of the Government to the requirements of the first program year and to those of such succeeding years as may be funded by the Government;

(ii) the applicable Cancellation of Items clause (see 7–104.47(b), 7–1903.33(b), or 7–1903.33(d)), which allows the Government to cancel, by a specified date or within a specified period, all remaining program years; and

(iii) the cancellation ceiling set forth in the schedule.

(10) A statement in the solicitation schedule that award will not be made on less than the stated first program year requirements.

1-322.2

**ARMED SERVICES PROCUREMENT REGULATION**

64

**GENERAL PROVISIONS**

(b) Where a noncompetitive acquisition is involved, solicitations shall include:

(1) A statement of the requirements for the multiyear contracting, including the requirements for each program year thereunder.

(2) A provision that the unit price of each item in the multiyear requirement shall be the same for all program years (level unit price) included therein;

(3) A provision setting forth a separate cancellation ceiling and dates applicable to each program year subject to cancellation (see (c) below).

(4) A prominently placed provision directing attention to the multiyear features of the solicitation; and to—

(i) the applicable Limitation of Price and Contractor Obligations clause (see 7–104.47(a) or 7–1903.33(c)), which limits the payment obligation of the Government to the requirements of the first program year and to those of such succeeding program years as may be funded by the Government;

(ii) the applicable Cancellation of Items clause (see 7–104.47(b), 7–1903.33(b), or 7–1903.33(d)), which allows the Government to cancel by a specified date or within a specified period, all remaining program years; and

(iii) the cancellation ceiling set forth in the schedule.

(c) The term "cancellation" as used in multiyear contracting, except as otherwise provided for modified requirements contracts in 1–322.8(c)(9)(iv), refers only to the cancellation of the total requirements of all remaining program years (see also 1–322.1(b)(5)). Such cancellation results from:

(1) Notification from the contracting officer to the contractor of nonavailability of funds for contract performance for any subsequent program year; or

(2) Failure of the contracting officer to notify the contractor that funds have been made available for performance of the succeeding program year requirement. For each program year except the first, the contracting officer shall establish a cancellation ceiling applicable to the requirements of the remaining program years which are subject to cancellation. Such ceilings shall be expressed in the schedule and shall be a not-to-exceed amount to apply alike to all bidders or offerors. The cancellation ceiling for each program year shall be in direct proportion to the total requirements at the beginning of that year and all remaining years subject to cancellation. For example, consider that the total nonrecurring costs are estimated at 10% of the total multiyear price and the total multiyear requirements for 5 years are 30% in the first year, 30% in the second, 20% in the third, 10% in the fourth, and 10% in the fifth.

1-322.2

**ARMED SERVICES PROCUREMENT REGULATION**

65

**GENERAL PROVISIONS**

Cancellation percentages would be 7, 4, 2, and 1% of the total multiyear price applicable

at the beginning of the second, third, fourth, and fifth program years, respectively. In determining cancellation ceilings, the contracting officer must estimate reasonable preproduction or startup, labor learning, and other nonrecurring costs to be incurred by an "average" prime or subcontractor, which would be applicable to, and which normally would be amortized over, all items or services to be furnished under the multiyear requirements. They include such costs as the following, where applicable: plant or equipment relocation or rearrangement; special tooling and special test equipment; preproduction engineering; initial rework; initial spoilage; pilot runs; allocable portions of the costs of facilities to be acquired or established for the conduct of the work; costs incurred for the assembly training and transportation of a specialized work force to and from the job site; and unrealized labor learning. They shall not include any costs of labor or materials, or other expenses (except as indicated above), which might be incurred for performance of subsequent program year requirements. The total estimate of the above costs must then be compared with the best estimate of the contract cost to arrive at a reasonable percentage or dollar figure. Cancellation dates for each program year's requirements shall be established as appropriate.

(d) Original cancellation ceilings and dates may be revised after issuance of a solicitation if it is found that such ceilings and dates are not realistic. In the case of formal advertising, such changes shall be by amendment of the invitation for bids prior to bid opening. In two-step formal advertising, discussion conducted during the first step may indicate the need for revised ceilings and dates (which may be incorporated) in step two. In a negotiated acquisition, negotiations may provide information which requires a change in cancellation ceilings and dates (see 3–805.4).

(e) In order to assure that all interested sources of supply are thoroughly aware of how multiyear contracting is accomplished, use of presolicitation or prebid conferences may be advisable.

(f) *Price Adjustment/Economic Price Adjustment Clauses.* In the case of supplies, the contracting officer should ascertain whether economic price adjustment provisions are appropriate in light of 3–404.3. When the Service Contract Act of 1965, as amended, clause is included is a contract (see 7–1903.41(a)), the appropriate price adjustment clause in 7–1905 shall be used. The latter clause may be modified in overseas contracts to allow for economic price adjustment when laws, regulations, or international agreements require contractors to pay higher wage rates. In cases when potential fluctuations in labor or material costs are such that contingencies therefor are not provided for in 7–1905 and are likely otherwise to be included in the multiyear contract price, the contracting officer may use a provision for economic price adjustment authorized by 3–404.3(c).

1-322.2
## ARMED SERVICES PROCUREMENT REGULATION

66
## GENERAL PROVISIONS

(g) In the event of a cancellation, the contractor is entitled to payment as consideration therefor in accordance with the terms of the applicable Cancellation of Items clause (see 1–322.5) in an amount not to exceed the cancellation ceiling.

(h) The schedule shall contain a provision limiting the payment obligation of the Government to a monetary amount, there described as being available for contract performance. Such amount for the first program year requirements shall be inserted by the contracting officer upon award of the contract and shall be modified for successive program years upon availability of funds for those years.

(i) In the event the contract is terminated in whole for the convenience of the Government, including items subject to cancellation, the Government's obligation shall not exceed the amount set forth in the schedule as available for contract performance, plus the applicable amount established as the cancellation ceiling.

1–322.3 *Evaluation.*

(a) Evaluation of offers in a multiyear acquisition involves not only determination of the lowest overall evaluated cost to the Government for both alternatives, the multiyear acquisition and the first program year acquisition; it also involves the comparison of the cost of buying the total requirement in successive independent acquisitions. All the factors to be considered for the various evaluations involved shall be set forth in the solicitation.

(b) In the event the Government determines prior to award that only the first program year quantities are actually required, only the offers on the first program year requirements will be evaluated. When the solicitation does not permit the submission of prices on a single year basis, the single year requirement will be resolicited.

(c) The cancellation ceiling shall not be a factor for evaluation. Unless Government administrative costs incident to annual contracting methods and contract administration can be reasonably established and supported, they shall not be used as a factor for evaluation. When administrative costs are to be used in evaluation, the dollar amount to be used shall be stated in the solicitation.

(d) In the case of supplies, delivery destination may be unknown for certain quantities due to the extended duration of contract performance. Such cases shall be handled in accordance with 19–208.4.

(e) When Government production and research property is provided pursuant to Section XIII, Part 3, the use of such property may be on a rent-free basis under the policies contained in Section XIII, Part 5. In this event the solicitation shall set forth a detailed description of the procedure to be followed and the factors to be considered, in accordance with Section XIII, Part 5, for the elimination of competitive advantage. The amount added for evaluation to each offeror's unit price for the first program year requirement shall also be added to his unit price for the multiyear requirements.

1-322.3

**ARMED SERVICES PROCUREMENT REGULATION**

67

**GENERAL PROVISIONS**

(f) When the solicitation requires the submission of prices for the first program year requirements in accordance with 1–322.2(a)(2)(i), bids or offers which submit prices the multiyear requirements only shall be rejected as non-responsive.

(g) When the solicitation provides for submission of prices only for the total multiyear quantity in accordance with 1–322.2(a)(3)(i), submission of prices for a single year quantity will be disregarded for any purpose but will not render the bid or offer nonresponsive as to any alternate multiyear submission by the same bidder or offeror.

(h) To determine the lowest evaluated unit price, compare the lowest evaluated bid or offer on the first program year alternative against the lowest evaluated bid or offer on multiyear alternative, as follows:

(1) Multiply the evaluated unit price for each item the lowest evaluated bid or offer on the first program year alternative times the total number of units of that item required by the multiyear alternative. Then,

(2) Take the sum of these products, for all the items plus the dollar amount of any administrative costs of the Government that are to be used in the evaluation. Finally,

(3) Compare this result against the total evaluated price of the lowest bid or offer on the multiyear alternative.

(4) The evaluation procedures contained in this paragraph (h) may be modified if necessary to meet the unique circumstances of a particular procurement.

(i) Where the multiyear acquisition is being competed on a basis other than price alone, the solicitation shall advise of the relative importance of the evaluation factor

**1-322.4 Award.**

(a) Award shall be made:

(1) On the basis of the lowest evaluated unit price determined in accordance with 1–

322.3, whether that price on a single year basis or a multiyear basis; or

(2) To that offeror submitting the proposal most advantageous to the Government, price and other evaluation factors considered, where the acquisition is on the basis of price and other factors.

(b) In the case of noncompetitive acquisitions, award shall be made only if a detailed review of the cost and technical proposals supports the determination made under 1–322.1(d)(3) or (4), and significant benefits or cost savings will result from multiyear acquisition.

(c) Prior to award of a multiyear contract, the contracting officer shall verify that findings made in accordance with 1–322.1(d)(3) or (4) remain valid and shall annotate the findings document accordingly.

1–322.5 *Clauses.* The clauses in 7–104.47(a) and (b) shall be included supply contracts under the multiyear contracting method, and the clauses in 7–1903.33(a) and (b) shall be included

### 1-322.5

### ARMED SERVICES PROCUREMENT REGULATION

### 68

### GENERAL PROVISIONS

in all contracts for the contracting of services under the multiyear contracting method, except as provided in 1–322.6 and 1–322.7.

1–322.6 *Multiyear Contracting of Services Under Public Law 90–378.*

(a) Under Public Law 90–378 (10 U.S.C. 2306(g)), the Department of Defense is authorized to enter into multiyear acquisitions for the following listed services, to obtain requirements which are not in excess of the Five–Year Defense Program and for which funds are limited by statute for obligation during the fiscal year in which the contract is executed:

(i) operation, maintenance, and support of facilities and installations;

(ii) maintenance or modification of aircraft, ships, vehicles, and other highly complex military equipment;

(iii) specialized training necessitating high quality instructor skills (for example, pilot and other aircrew members; foreign language training); and

(iv) base services (for example, ground maintenance; in-plane refueling; bus transportation; refuse collection and disposal).

However, such acquisitions shall be entered into for no more than a 5–year period and only when such acquisitions are consistent with the policies of and satisfy the requirements set forth in 1–322.1 through 1–322.5 (except as provided in (b) and (c) below). The performance years specified in the schedule shall not extend beyond the end of any fiscal year (1 October—30 September).

(b) Since acquisitions under this authority are limited for execution on a fiscal year basis, references to "program year" throughout 1–322.6 shall be considered to mean "fiscal year."

(c) *Clauses.* The clauses in 7–1903.33(c) and (d) shall be included in all service contracts for the acquisition of services under this paragraph 1–322.6 on a multiyear basis.

1–322.7 *Multiyear Acquisition of Supplies and Services Under Public Law 91–142.*

(a) *General.* Under Section 512 of Public Law 91–142, the Department of Defense is authorized to enter into contracts for periods of no more than 4 years for supplies and services required for the maintenance and operation of family housing for which funds would otherwise be available only within the fiscal year for which appropriated. Such acquisitions shall be entered into only when they are consistent with the policies and satisfy the requirements set forth in 1–322.1 through 1–322.5 (except as provided in (b) and (c) below). The performance years specified in the schedule shall not extend beyond the end of any fiscal year (1 October—30 September).

(b) *Limitation.* Since acquisitions under this authority are limited for execution on a fiscal year basis, references to "program year" throughout 1–322.6 shall be considered to mean "fiscal year."

(c) *Clauses.* The clauses in 7–1903.33(c) and (d) shall be included in all contracts for the acquisition of supplies or services under this paragraph 1–322.7 on a multiyear basis.

**1–322.8** *Multiyear Acquisition Using Modified Requirements Type Contracts.*

(a) *Description of Procedure.* Multiyear acquisition of supplies and/or services may be conducted using a requirements-type contract, modified from the 3–409.2 type as described below. This type of contract will only be used when anticipated annual requirements, expressed as the Best Estimated Quantity (BEQ), can be projected with reasonable certainty. Under this method, a contract is awarded for specified supplies and/or services up to a designated maximum quantity with orders placed on an as-required basis during the multiyear period. Contracts awarded on the first program year requirements only will not include provision for cancellation charges. The modified requirements-type contract differs from the 3–409.2 requirements-type contract in the following respects:

(1) Contract quantities anticipated to be acquired are set forth in the contract as the BEQ.

(2) Nonrecurring costs are to be amortized on the BEQ

(3) The contractor is entitled to reimbursement for preproduction and other nonrecurring costs in accordance with the contract schedule cancellation ceiling in the event that the Government orders lesser quantities than the aggregate BEQ, or cancels program year requirements by cancellation notice.

(4) Quantities in excess of the aggregate BEQ and up to the maximum quantity set forth in the schedule will be priced exclusive of the nonrecurring costs amortized on the BEQ.

(b) *Solicitation Procedures.* Solicitation procedures shall be in conformance with 1–322.2, except that the term "requirements" as used in 1–322.2 will be deemed to mean BEQ. The solicitation shall include:

(1) A BEQ and a maximum quantity for each item for both the first program year and for each subsequent program year. The maximum quantity for individual program years is not separately priced.

(2) A line item, essentially as follows, to apply to quantities exceeding the aggregate multiyear BEQ:

"The price established for this line item is applicable to all units ordered in excess of the aggregate BEQ of ... and up to the total multiyear contract maximum quantity of ....."

(3) Applicable solicitation schedule notes, essentially as follows:

(i) "NOTE 1: Offeror will submit unit price for the single year requirement, which shall apply to all quantities up to the single year maximum in the event that a 1–year requirements contract is awarded for the single year requirement only. If a contract is awarded on the first program year requirements only, such a contract will not provide for any cancellation charges."

(ii) "NOTE 2: Offeror will submit a single unit price, inclusive of nonrecurring costs, to be entered on the schedule as the BEQ price for each program year, applicable to quantities within and up to the aggregate BEQ, under multiyear procedures."

(iii) "NOTE 3: Offerors will also submit a single unit price, exclusive of nonrecurring costs amortized over the BEQ, applicable

only to quantities ordered in excess of the aggregate BEQ and up to the total multiyear contract maximum quantity."

(4) A provision that quantities ordered in excess of the program year BEQ but which do not exceed the aggregate BEQ will be priced inclusive of nonrecurring costs.

(5) A provision that evaluation will be on the basis of the lowest unit price offered for the first program year BEQ against the lowest unit price offered for the aggregate BEQ.

(6) A provision setting forth a single cancellation ceiling, applicable only in the event of contract award on the multiyear basis.

(7) A notification that the amount of cancellation charges payable shall be determined on the basis of the ratio between the total quantity ordered at the time of cancellation and the aggregate contract BEQ.

(8) A date or specific time period for Government notification to the contractor as to the availability or nonavailability of funds and any anticipated significant changes in the BEQ for the succeeding program year.

(9) The following clauses shall be included under the multiyear requirements method:

(i) *Ordering.* Insert the clause at 7–1101.

(ii) *Delivery Order Limitations.* Insert the clause at 7–1102 .2(a).

(iii) *Requirements.* Insert the clause at 7–1102.2(b)(5).

### 1-322.8

### ARMED SERVICES PROCUREMENT REGULATION

### 71

### GENERAL PROVISIONS

(iv) *Cancellation of Items.* Insert the clause at 7–104.47(b), 7–1903.33(b) or 7–1903.33(d), but the solicitator shall provide that in the event the contract is awarded on the alternative multiyear basis, paragraph (b) of the clause will be deleted and

the following will be substituted for paragraph (b) of the clause:

(Paragraph (b) of clause referenced above)

(b) As used herein, the term "cancellation" means that the Government is cancelling, pursuant to this clause, its anticipated requirements for items as set forth in the schedule for all program years subsequent to that in which notice of cancellation is provided. Such cancellation shall occur if, by the date or within the time period specified in the schedule or such further time as may be agreed to, the Contracting Officer (i) notifies the Contractor that funds will not be available for contract performance for any subsequent program year; or (ii) fails to notify the Contractor that funds will be available for performance of a requirement for the succeeding program year. "Cancellation" shall also be deemed to have occurred if, upon expiration of the final program year, the Government has failed to order the specified items in quantities up to the aggregate Best Estimated Quantity set forth in the schedule. Following cancellation under this clause of any program year(s), the Government shall not be obligated to issue nor the Contractor to accept any further orders under this contract.

### 1-332.8

### ARMED SERVICES PROCUREMENT REGULATIONS

### 72